John WINTON and Evelyn Winton, Plaintiffs,

v.

BOARD OF COMMISSIONERS OF TULSA COUNTY, OKLAHOMA, et al., Defendants.

No. 97–CV–841–J.

United States District Court, N.D. Oklahoma.

Feb. 22, 2000.

Donald Gregory Bledsoe, Tulsa, OK, Steven Alan Novick, Tulsa, OK, for Plaintiffs.

Ceylon Smith Lewis, III, Gretchen M. Schilling, Riggs Abney Neal Turpen Orbison & Lewis, Tulsa, OK, Dick Austin Blakeley, Fred Jean Morgan, II, Linda Kay Greaves, Dist. Atty's Office, Tulsa, OK, for Defendant Tulsa County Bd. of County Comm'rs.

Glenn Reuben Davis, Donald A. Lepp, Boone Smith Davis Hurst & Dickman, Tulsa, OK, Dick Austin Blakeley, Fred Jean Morgan, II, Linda Kay Greaves, for Defendant Stanley Glanz, Tulsa County Sheriff's Department.

Bobby L. Latham, Jr., Kenneth E. Wagner, Catherine P. Nichols, Latham Stall Wagner Steele & Lehman PC, Tulsa, OK, for Wexford Health Source.

### ORDER

JOYNER, United States Magistrate Judge.

**TABLE OF CONTENTS**

I. INTRODUCTION ...............................................1252
 A. FACTUAL SUMMARY ......................................1252
 B. SUMMARY OF CLAIMS ASSERTED BY PLAINTIFFS ..............1253
 1. First Claim— § 1983: Failure to Protect Mr. Winton From Inmate-on–Inmate Violence ...........................................1253
 2. Second Claim— § 1983: Failure to Provide Medical Care to Mr. Winton ..............................................1253
 3. Third Claim—Wexford's Medical Malpractice ...........................1253
 4. Fourth Claim—Sheriff Glanz' *Per Se* Negligence ........................1253
 5. Fifth Claim—Mrs. Winton's Loss of Consortium .......................1253

II. SUMMARY JUDGMENT STANDARDS ...................................1253

III. FIFTH CLAIM—AS A MATTER OF LAW, MRS. WINTON CANNOT RECOVER FOR LOSS OF CONSORTIUM UNDER 42 U.S.C. § 1983.....1253

IV. FIRST AND SECOND CLAIMS—MR. WINTON'S DUE PROCESS CLAIMS BASED ON DEFENDANTS' ALLEGED FAILURE TO PROTECT HIM FROM ATTACKS BY OTHER INMATES AND PROVIDE HIM NECESSARY MEDICAL CARE WHILE A PRETRIAL DETAINEE IN THE JAIL ...........................................1256
 A. INTRODUCTION .........................................1256
 B. ELEMENTS OF AN EIGHTH AMENDMENT VIOLATION .............1257
 1. Right to Medical Care Under the Eighth Amendment ..................1257
 2. Right to Safety Under the Eighth Amendment ........................1258
 C. DELIBERATE INDIFFERENCE ..............................1259
 1. As Applied to Sheriff Glanz Individually .........................1259
 2. As Applied to the County ......................................1262
 D. APPLICATION OF THE DELIBERATE INDIFFERENCE STANDARD TO THIS CASE......................................1263
 1. Failure to Protect from Harm .......................................1263
 a. *Sheriff Glanz' Individual Liability*................................1263
 i. *Sheriff Glanz' Qualified Immunity* ...........................1267
 b. *The County's Liability* .......................................1267
 2. Denial of Medical Care ...........................................1269
 a. *Sheriff Glanz' Individual Liability*................................1269
 i. *Sheriff Glanz' Qualified Immunity* ...........................1270
 b. *County's Liability* ..........................................1270

CONCLUSION .....................................................1270

Now before the Court is a motion for summary judgment filed by the Board of County Commissioners of Tulsa County ("County") and Tulsa County Sheriff Stanley Glanz. [Doc. No. 21].[1] For the reasons discussed below, the Court finds that the County and the Sheriff are entitled to summary judgment on Plaintiffs' Fifth Claim for Relief. The County and the Sheriff are not, however, entitled to summary judgment on either the First or Second Claim for Relief. The County's and

---

**1.** When the motion for summary judgment was originally filed, the County and Sheriff Glanz were represented by the same counsel—Tim Harris, the Tulsa County District Attorney. After the motion for summary judgment was filed, a conflict of interest arose between the County and Sheriff Glanz. The District Attorney could not, therefore, continue to represent the County and Sheriff Glanz. Consequently, the District Attorney withdrew as counsel for both the County and Sheriff Glanz. *See* Doc. Nos. 54 and 55. After the District Attorney's withdrawal, the County and Sheriff Glanz each obtained separate counsel. The Court then permitted the summary judgment record to be supplemented, giving new counsel an opportunity to be heard on the issues raised by the original motion for summary judgment. *See* Doc. Nos. 63, 64, 79 and 82. The Court will, therefore, consider there to be two separate motions for summary judgment at issue—one filed by the County and its counsel and one filed by the Sheriff and his counsel.

**1252**

the Sheriff's motions for summary judgment are, therefore, GRANTED IN PART AND DENIED IN PART.

## I. INTRODUCTION

### A. FACTUAL SUMMARY [2]

Plaintiff, John Winton, is a white male and he is married to Plaintiff, Evelyn Winton. Mr. Winton was arrested and booked into the Tulsa County Jail ("the Jail") on September 5, 1995 for shooting with the intent to kill, a charge which was later dismissed. Mr. Winton was booked into cell 8A78 of the Jail located on the eighth floor of the Tulsa County courthouse. Mr. Winton remained in the Jail, as a pretrial detainee, from September 5, 1995 to September 19, 1995 when he bonded out of the Jail.

In the morning of September 17, 1995, Mr. Winton complained to a jail detention officer that black inmates in cell 8A78 were stealing food from white inmates. The detention officer told Mr. Winton to file a grievance. While in the presence of the other inmates in cell 8A78, the officer gave Mr. Winton a grievance form to fill out. Mr. Winton completed and submitted the grievance form. When dinner was served on the evening of September 17th, the detention officer announced that food would be distributed in a different manner due to the filing of a grievance.

In the late evening of September 17, 1995, or the early morning of September 18, 1995, Mr. Winton was attacked and beaten by black inmates in cell 8A78. Certain black inmates pulled Mr. Winton from a top bunk and dropped him head-first on the cell's concrete floor. While on the floor, Mr. Winton was kicked and beaten by black inmates. At approximately 7:30 a.m. on September 18, 1995, Mr. Winton was removed from cell 8A78 and transferred to a medical cell. Mr. Winton's left arm was x-rayed and placed in an elastic wrap by a Wexford [3] nurse. Mr. Winton

was then returned to the general population. Later in the day on September 18th, at approximately 7:00 p.m., Mr. Winton was removed from the general population and placed in medical cell 9J39 for observation. At approximately 5:30 p.m. the next day, September 19, 1995, Mr. Winton posted bond and was released from custody.

When Mr. Winton was attacked, cell 8A78 was overcrowded. Some inmates were sleeping on portable beds. At the time of the attack, the racial makeup of cell 8A78 was approximately 17 black and 11 white inmates.

The County and Sheriff Glanz admit that at the time of the attack on Mr. Winton the Tulsa County Jail was a "dangerously outmoded facility that [was] conducive to violence." Doc. No. 32, p. 3. This was particularly true on the eighth and ninth floors of the Tulsa County courthouse, where Mr. Winton was detained, because those floors were used to house the most violent offenders in Tulsa County. *Id.* The condition of the Jail has spawned a culture of excessive inmate violence which has resulted in many serious injuries to inmates. Sheriff Glanz admits that he has been aware of the problem of excessive inmate violence since at least 1992. *Id.*

After bonding out of the jail, Mr. Winton admitted himself to Tulsa Regional Medical Center on September 20, 1995. Mr. Winton was hospitalized briefly and diagnosed with the following: multiple abrasions and contusions, a cerebral contusion, a very small subdural hematoma on the left, a basilar skull fracture on the right with conductive hearing loss, a left wrist fracture, and a dislocated left shoulder. Doc. No. 31, Exhibit "7." Mr. Winton's wrist fracture required surgery, which was performed on October 3, 1995. A closed reduction, with the insertion of pins, was

---

**2.** For purposes of Defendants' motions for summary judgment only, the Court finds no genuine dispute regarding the facts summarized in this section. *See* Fed.R.Civ.P. 56(d).

**3.** The County contracts with Wexford Health Sources, Inc. ("Wexford") to provide medical services to prisoners and pre-trial detainees in the Jail.

performed on Mr. Winton's left wrist. At the conclusion of the surgery, Mr. Winton's recovery prognosis was guarded. *Id.*

### B. SUMMARY OF CLAIMS ASSERTED BY PLAINTIFFS

Plaintiffs' Amended Complaint asserts five claims for relief against four defendants. Plaintiffs have dismissed one defendant—Tulsa County Sheriff's Deputy, Jack Putman. *See* Doc. No. 49. The remaining defendants are: the County, Sheriff Glanz and Wexford. Wexford has not filed a motion for summary judgment. This Order will not, therefore, address the claims currently pled solely against Wexford.

### 1. First Claim— § 1983: Failure to Protect Mr. Winton From Inmate–on–Inmate Violence

In their First Claim for Relief, Plaintiffs allege that the County and Sheriff Glanz were deliberately indifferent to a serious risk to John Winton's safety while Mr. Winton was a pre-trial detainee in the Tulsa County Jail. Plaintiffs allege that Defendants' deliberate indifference violated Mr. Winton's Fourteenth Amendment rights. Plaintiffs seek compensation for violation of Mr. Winton's Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983.

### 2. Second Claim— § 1983: Failure to Provide Medical Care to Mr. Winton

In their Second Claim for Relief, Plaintiffs allege that the County, Sheriff Glanz and Wexford were deliberately indifferent to John Winton's serious medical needs while Mr. Winton was a pre-trial detainee in the Tulsa County Jail. Plaintiffs allege that Defendants' deliberate indifference violated Mr. Winton's Fourteenth Amendment rights. Plaintiffs seek compensation for violation of Mr. Winton's Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983.

### 3. Third Claim—Wexford's Medical Malpractice

In their Third Claim for Relief, Plaintiffs allege that Wexford, as Mr. Winton's physician, failed to exercise reasonable care in the diagnosis and treatment of his serious injuries. Because this claim relates solely to Wexford, and because Wexford has not yet filed a motion for summary judgment, the Third Claim for Relief will not be discussed in this Order.

### 4. Fourth Claim—Sheriff Glanz' *Per Se* Negligence

In their Fourth Claim for Relief, Plaintiffs allege that Sheriff Glanz was negligent *per se* pursuant to 57 Okla. Stat. § 54 and 19 Okla. Stat. §§ 513 and 547. Plaintiffs have dismissed this claim. *See* Doc. Nos. 80 and 81.

### 5. Fifth Claim—Mrs. Winton's Loss of Consortium

In their Fifth Claim for Relief, Plaintiffs allege that Evelyn Winton, as a direct result of the violation of her husband's constitutional rights, was deprived of her husband's consortium, companionship and services. Plaintiffs allege that Mrs. Winton can recover for her loss of consortium under 42 U.S.C. § 1983 because her claim is derivative of Mr. Winton's § 1983 claim.

As to Wexford only, Plaintiffs also allege that Mrs. Winton is entitled to recover for her loss of consortium under Oklahoma's tort law. Because the loss of consortium tort claim relates solely to Wexford, and because Wexford has not yet filed a motion for summary judgment, the loss of consortium tort claim against Wexford will not be discussed in this Order.

## II. SUMMARY JUDGMENT STANDARDS

A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court will find no genuine issue of triable fact if it determines that the summary judgment record taken as a whole could not lead a rational trier of fact to find for Plaintiff. Because Plaintiff will bear the burden of proof at trial, Plaintiffs must go beyond their

pleadings and identify specific facts which establish the existence of each element essential to their case. Defendants need only point to an absence of evidence to support a single element of Plaintiffs' case. The court will, however, resolve all doubts in favor of Plaintiff, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Conaway v. Smith*, 853 F.2d 789, 792 n. 4 (10th Cir.1988); *Norton v. Liddel*, 620 F.2d 1375, 1381 (10th Cir.1980).

### III. FIFTH CLAIM—AS A MATTER OF LAW, MRS. WINTON CANNOT RECOVER FOR LOSS OF CONSORTIUM UNDER 42 U.S.C. § 1983.

■ Plaintiffs argue that Mrs. Winton may bring a loss of consortium claim "as a derivative claim under 42 U.S.C. § 1983 based upon the violation of her husband's constitutional rights." Doc. No. 30, p. 8. The Court does not agree. Plaintiffs' argument is precluded by relevant Tenth Circuit precedent, which none of the parties have adequately addressed.

Section 1983 does not generally impose liability for the violation of a duty of care arising solely out of tort law. Rather, § 1983 imposes liability only when state actors violate rights protected by the constitution or laws of the United States. It is a "well-settled principle that a section 1983 claim must be based upon the violation of [a] plaintiff's personal rights, and not the rights of someone else." *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir.1990). Regardless of what happened to Mr. Winton, to allege a § 1983 claim, Mrs. Winton must demonstrate that she suffered the deprivation of a constitutional right possessed by her individually. *Id. See also Trujillo v. Board of County Commissioners of County of Santa Fe*, 768 F.2d 1186, 1190 (10th Cir.1985); and *Teufel v. United States*, No. 92–3260, 1993 WL 345530, at *2 (10th Cir. Aug. 26, 1993). Mrs. Winton has not identified any constitutional right possessed by her individually. Rather, as her brief states she bases her § 1983 claim on the violation of her husband's constitutional rights, and not on the violation of her own constitutional rights.

Even if Mrs. Winton were attempting to predicate her loss of consortium claim on a violation of her own constitutional rights, the Court would not find such an argument persuasive. The Court finds persuasive the Seventh Circuit's analysis in *Niehus v. Liberio*, 973 F.2d 526 (7th Cir.1992), finding no constitutional right to spousal consortium.

The relationships that define the nuclear family—relationships that for many people are constitutive of their very identity—are [constitutionally] protected, as we have seen, and if consortium were a synonym for marriage Mrs. Niehus would have a stronger claim, though whether strong enough we need not speculate. But consortium is not a synonym for marriage. It is the name of the sexual and other services (apart from financial support) that spouses render to each other. A loss of consortium can therefore be as minor and transient as a wife's losing a month's help from her husband in mowing the lawn and washing the dishes and grooming the cat, and as major as the loss of all spousal services consequent upon an injury that renders the injured spouse a human vegetable.

Deprivations of the lesser services comprehended in the portmanteau term "consortium" are not deprivations of liberty within the restricted meaning that the term bears in the Constitution. The right to a husband's assistance in raking leaves is not a liberty protected by the Fourteenth Amendment. But Mrs. Niehus has not asked [the Court] to confine the constitutional right of consortium to the greater deprivations. She wants [the Court] to rule that consortium is liberty, period. [The Court] declines the invitation.

*Niehus,* 973 F.2d at 533–34 (internal citations omitted). Like Mrs. Niehus, Mrs. Winton also has not established a constitutional right to the consortium of a spouse.

Plaintiffs cite as support for their argument the Tenth Circuit's decision in *Berry v. City of Muskogee, Oklahoma,* 900 F.2d 1489 (10th Cir.1990). The Court finds no support for Plaintiffs' argument in *Berry.* In *Berry* the widow of an inmate who was killed by fellow inmates brought a § 1983 claim against the city responsible for the jail. The issue with which the Tenth Circuit had to struggle in *Berry* was the appropriate remedy under § 1983 for constitutional violations that result in death (i.e., what damages could the widow recover under § 1983). In particular, the court had to determine whether it would incorporate into § 1983, *via* § 1988(a), the remedies provided by Oklahoma's survival and wrongful death statutes.

Section 1988(a) provides as follows:

The jurisdiction [provided by the civil rights statutes] for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

42 U.S.C. § 1988(a). Section 1988(a) establishes a three-step process which federal courts are to use to determine whether to borrow law from another source to aid in the enforcement of federal civil rights statutes. *Berry,* 900 F.2d at 1502. Section 1988 directs the court to look first at federal law to determine whether, given the facts of the case before it, federal law is suitable to give effect to the federal civil rights statutes. If federal law is deficient (e.g., it fails to provide suitable remedies given the facts), courts may consider borrowing the law of the forum state. The court may, however, reject the forum state's law if the state's law is inconsistent with the Constitution or laws of the United States. *Id.* If federal law is deficient and the forum state's law is inconsistent with existing federal law, courts may create a species of federal common law, which the Tenth Circuit did in *Berry.*

In *Berry* the Tenth Circuit held that with respect to constitutional violations resulting in death, federal law was deficient because it failed to provide adequate remedies. The court then looked to Oklahoma law (i.e., the law of the forum), but found that a wholesale adoption of the remedies in Oklahoma's survival and wrongful death statutes would be inconsistent with federal law. The Tenth Circuit proceeded, therefore, to fashion a "federal remedy" to be applied to § 1983 death cases. *Berry,* 900 F.2d at 1506–1507. What is instructive for purposes of this case are the reasons why the Tenth Circuit rejected Oklahoma's statutory remedies in favor of a federal remedy.

The Tenth Circuit rejected the argument that Oklahoma's survival and wrongful death remedies should be applied wholesale to § 1983 death actions because Oklahoma would have permitted the plaintiff to recover items the decedent could not have recovered had he lived to sue for himself. *Berry,* 900 F.2d at 1506. An example of one such item cited by the Tenth Circuit was the loss of consortium of the surviving spouse. *Id.* The federal remedy ultimately approved by the court for § 1983 death actions was a survival-type action to be brought by the estate of the deceased victim. The court held that appropriate compensatory damages would include damages that the decedent would have been able to recover had he lived to

sue. The court did not permit recovery in § 1983 death actions for the loss of consortium suffered by the decedent's spouse or family. *Id.* at 1507. If the Tenth Circuit was unwilling to permit a loss of consortium claim under § 1983 by the widow of a pre-trial detainee, the Court sees even less of a reason to allow a loss of consortium claim in this case where the pre-trial detainee (Mr. Winton) was injured, but not killed.

The Fifth Circuit cases Plaintiffs rely on are at odds with the Tenth Circuit's holding in *Berry*.[4] The Fifth Circuit cases cited by Plaintiffs are all based on the Fifth Circuit's holding in *Brazier v. Cherry*, 293 F.2d 401 (5th Cir.1961). In *Brazier*, the Fifth Circuit, like the Tenth Circuit in *Berry*, had to determine what damages are available in a § 1983 death action. *Brazier* was decided several years before *Berry* and the Tenth Circuit refers to the *Brazier* opinion several times in its *Berry* decision. In *Brazier*, the Fifth Circuit incorporated wholesale into § 1983 death cases those remedies available in Georgia's survival and wrongful death statutes, which included the right of a surviving spouse to recover for his/her own loss of consortium. The Fifth Circuit's decision to adopt the state's wrongful death statute wholesale was the approach specifically rejected by the Tenth Circuit in *Berry*. As discussed above, the Tenth Circuit rejected the Fifth Circuit approach because it

believed that a wholesale adoption of Oklahoma's wrongful death remedies would, in certain instances, permit a person to recover when that person had not been aggrieved by a violation of their own constitutional rights. One example given by the Tenth Circuit of when this might occur is when a spouse sought to recover for his/her own loss of consortium. This Court is bound to follow the Tenth Circuit's decision in *Berry*, not the Fifth Circuit decisions cited by Plaintiffs.[5]

Mrs. Winton may not recover any damages under § 1983 for the alleged violation of her husband's constitutional rights and she has not alleged the violation of a constitutional right personal to her. Consequently, the Court hereby grants summary judgment in favor of the County and Sheriff Glanz on Plaintiffs' Fifth Claim for Relief. Plaintiffs' Fifth Claim for Relief is dismissed.

## IV. FIRST AND SECOND CLAIMS— MR. WINTON'S DUE PROCESS CLAIMS BASED ON DEFENDANTS' ALLEGED FAILURE TO PROTECT HIM FROM ATTACKS BY OTHER INMATES AND PROVIDE HIM NECESSARY MEDICAL CARE WHILE A PRETRIAL DETAINEE IN THE JAIL

### A. INTRODUCTION

■ The Eighth Amendment to the United States Constitution applies only af-

---

**4.** Plaintiffs rely on *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir.1992); *Flores v. Cameron County, Texas*, 92 F.3d 258 (5th Cir. 1996); and *Robinson v. Johnson*, 975 F.Supp. 950 (S.D.Tex.1996).

**5.** *Berry* was decided on April 10, 1990, several months before 28 U.S.C. § 1367 came into effect on December 1, 1990. Citing to *Robinson*, Plaintiffs suggest that the enactment of § 1367, as part of the Judicial Improvements Act of 1990, significantly impacts the issues raised by their Fifth Claim for Relief. However, in the context of Plaintiffs' Fifth Claim for Relief against the County and Sheriff Glanz, § 1367 is a red herring. Section 1367 would have significance here only if Mrs. Winton was attempting to assert a loss of consortium claim under Oklahoma law as a

pendent party claim in connection with Mr. Winton's federal civil rights claim. Prior to the enactment of § 1367, the Court in all likelihood would not have permitted a pendent party loss of consortium claim under state law to be joined with a federal civil rights claim. *See Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). Congress effectively overruled *Finley* by enacting § 1367. Section 1367 restores pendent party jurisdiction to federal courts, and under § 1367(a), a pendent party loss of consortium claim under state law can now be joined with a federal civil rights claim. None of this is particularly relevant here because, as Plaintiffs have stated several times, Mrs. Winton's loss of consortium claim is not premised on Oklahoma law, but on federal law—namely § 1983.

ter an adjudication of guilt. The Eighth Amendment does not apply directly to pretrial detainees like Mr. Winton. Nevertheless, the Supreme Court and the Tenth Circuit have held that the Eighth Amendment's protections apply to pretrial detainees through the due process clause of the Fourteenth Amendment. The Fourteenth Amendment due process rights of a pretrial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *See Bell v. Wolfish,* 441 U.S. 520, 535–37, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Lopez v. LeMaster,* 172 F.3d 756, 759 n. 2 (10th Cir.1999); *Garcia v. Salt Lake County,* 768 F.2d 303, 307 (10th Cir. 1985); and *Barrie v. Grand County, Utah,* 119 F.3d 862, 867 (10th Cir.1997).[6] Thus, if Plaintiffs can establish a violation of the Eighth Amendment then Plaintiffs can establish that Mr. Winton's Fourteenth Amendment rights, as a pretrial detainee, have been violated.

### B. ELEMENTS OF AN EIGHTH AMENDMENT VIOLATION

The Constitution does not mandate comfortable prisons, but it does prohibit inhumane prisons. The treatment a prisoner receives in prison, and the conditions under which he is confined, are subject to scrutiny under the Eighth Amendment to the United States Constitution. At a minimum, the Eighth Amendment requires prison officials to provide adequate food, clothing, shelter and medical care. Prison officials must also take reasonable measures to guarantee the safety of inmates. In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832–34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[H]aving

stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 834, 114 S.Ct. 1970. Being violently assaulted in prison is not "part of the penalty that criminal offenders pay for their offenses against society." *Id.* (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). *See also Ramos v. Lamm,* 639 F.2d 559, 572 (10th Cir.1980).

■ In the most general sense, a prison official violates the Eighth Amendment when the following two elements are established: (1) the inmate alleges an objectively serious deprivation by a prison official of food, clothing, shelter, medical care, or safety; and (2) the prison official acted with a sufficiently culpable state of mind to deprive the inmate of his right to food, clothing, shelter, medical care, or safety. Of particular relevance to this case, the Supreme Court has addressed these two general elements as they apply to the denial of medical care (*Estelle v. Gamble*) and the failure to protect from assault by other inmates (*Farmer v. Brennan*).

### 1. Right to Medical Care Under the Eighth Amendment

■ Prison officials have a constitutional duty under the Eighth Amendment to provide adequate medical care to prisoners. This duty requires prison officials to "make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates." *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.1980) (internal quotations omitted). In *Estelle,* the Supreme Court discussed the elements of an

6. The Eighth Amendment is part of the Bill of Rights contained in the federal constitution. On its face, the Bill of Rights applies only to the federal government. Through the doctrine of incorporation, however, the United States Supreme Court has applied various provisions of the Bill of Rights to the states. In short, the Supreme Court has determined that certain rights in the Bill of Rights are so fundamental that they are encompassed with-

in the term "liberty" as that term is used in the due process clause of the Fourteenth Amendment, which is directly applicable to the states. One of the rights found by the Supreme Court to be "incorporated" into the due process clause of the Fourteenth Amendment is the Eighth Amendment's right to be free from cruel and unusual punishment. *See Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

Eighth Amendment claim for denial of medical care. Applying the two general elements of an Eighth Amendment claim to a denial of medical care, the Supreme Court held that a prisoner would have to show (1) that he had a serious illness or injury, and (2) that the defendant was deliberately indifferent to the prisoner's serious illness or injury. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

■ Whether a prisoner has a serious illness or injury is to be determined using an objective inquiry. The Court in *Estelle* recognized that not only deprivations of medical care that produce physical torture or death are actionable. Less serious denials which cause or perpetuate pain are also actionable. A medical need is serious if it is one that has been diagnosed by a doctor as mandating treatment or if it is so obvious that even a lay person would easily recognize the need for a doctor's attention. *Ramos,* 639 F.2d at 575.

■ The Court finds that there is sufficient evidence in the summary judgment record from which a reasonable jury could find that after his September 18th beating Mr. Winton was suffering from objectively serious injuries. In particular, the injuries diagnosed at TRMC the day after the attack (e.g., multiple cuts and bruises, subdural hematoma, skull fracture, wrist fracture, etc.) establish that Mr. Winton suffered objectively serious injuries. At a minimum, there is a genuine issue of fact regarding the seriousness of Mr. Winton's injuries.[7] Defendants appear to concede as much, staking their defense entirely on the second, deliberate indifference, element of Plaintiffs' due process/Eighth Amendment claim. Consequently, Plaintiffs survive summary judgment on the first element of their Second Claim for denial of adequate medical care. The Court will discuss the deliberate indifference element below.

### 2. Right to Safety Under the Eighth Amendment

■ "It is not ... every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. In *Farmer,* the United States Supreme Court applied the general elements of an Eighth Amendment claim in a factual context similar to the one presented by this case. The plaintiff in *Farmer,* a convicted felon, alleged that the defendant prison officials violated his Eighth Amendment rights when they failed to protect him from being sexually assaulted by another inmate. Applying the two elements discussed above to Mr. Farmer's claim, the Court held that he would have to show (1) that he was "incarcerated under conditions posing a substantial risk of serious harm," and (2) that the defendants were deliberately indifferent to his safety. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970.[8]

7. The Court notes that the primary thrust of Plaintiffs' medical care claim is that the detention officers on duty the night of the attack unreasonably delayed in providing medical care to Mr. Winton. The Tenth Circuit has held that "an inmate who claims that delay in medical treatment rose to the level of a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Reece v. Groose,* 60 F.3d 487, 491, 492 (8th Cir.1995). *See also Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir.1999). Defendants have not moved for summary judgment based on Plaintiffs' failure to comply with *Reece.* The Court will, therefore, not address the adequacy of the medical evidence current-

ly in the record as it relates to Plaintiffs' claim of delayed medical treatment.

8. In *Farmer,* the Supreme Court applied the Eighth Amendment's elements to the failure to protect from assault claim raised by plaintiff in that case. Farmer's claim, and Plaintiffs' claim in this case, must be distinguished from situations where decisions by prison officials are made in haste, under pressure and without time for reflection (e.g., excessive force claims arising out of prison riots). The second element of an Eighth Amendment claim is interpreted differently in cases of emergency. In those cases, a plaintiff must show more than deliberate indifference by the prison officials. The plaintiff must show that

■ The Court finds that there is sufficient evidence in the summary judgment record from which a reasonable jury could find a substantial risk of serious harm from inmate-on-inmate attacks at the Tulsa County Jail during the period Mr. Winton was incarcerated there. The report complied by the United States Department of Justice ("DOJ") after its 1994 investigation; the 1994 and 1997 reports of Eugene Miller, an expert penologist; and Sheriff Glanz' deposition in *Durham v. Glanz* all establish that the Jail's 8th and 9th floors are a highly dangerous place with an unacceptably high risk of harm to inmates. There is also evidence to support the conclusion that many of the instances of inmate violence involve a group of inmates attacking one inmate—the same type of violence Mr. Winton experienced. At a minimum, there is a genuine issue of fact regarding the existence of a substantial risk of harm from inmate attacks during the period of Mr. Winton's incarceration at the Jail. Again, Defendants appear to concede as much, staking their defense entirely on the second, deliberate indifference, element of Plaintiffs' due process/Eighth Amendment claim. Consequently, Plaintiffs survive summary judgment on the first element of their First Claim for failure to protect Mr. Winton's safety. *See, e.g., Sims v. Schaad,* No. 98–1476, 1999 WL 387158, at * 3 (10th Cir. June 14, 1999). The Court will discuss the deliberate indifference element below.

## C. DELIBERATE INDIFFERENCE

■ Deliberate indifference, as a standard of liability, requires more than ordinary lack of due care for a prisoner's safety. The deliberate indifference liability standard is, however, satisfied by something less than an act or omission committed for the purpose of causing harm or with knowledge that harm will result. Deliberate indifference, therefore, lies somewhere above negligence and below intentional conduct. *Farmer,* 511 U.S. at 835–36, 114 S.Ct. 1970. It is fair to say "that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836, 114 S.Ct. 1970. The term "recklessness" is, however, not self-defining. It was the Supreme Court's primary goal in *Farmer* to give the term meaning in an Eighth Amendment context.

### 1. As Applied to Sheriff Glanz Individually

In *Farmer,* the Court was confronted with two definitions of recklessness to be applied to the conduct of individual prison officials: an objective and a subjective definition. The plaintiff in *Farmer* argued for an objective definition pursuant to which an individual prison official would be reckless if he acted or failed to act in the face of a serious risk of harm that he knew about or that was so obvious that he should have known about it. The defendants in *Farmer* argued for a subjective definition pursuant to which a prison official would be reckless only if he acted or failed to act in the face of a serious risk of which he was actually aware. *Farmer,* 511 U.S. at 836–37, 114 S.Ct. 1970. The Court adopted the defendants' subjective definition.

■ The Supreme Court has held on many occasions that the Eighth Amendment does not outlaw cruel and unusual "conditions." Rather, the Eighth Amendment outlaws cruel and unusual "punishments." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. The Court adopted the subjective definition of recklessness because of its belief that "an official's failure to alleviate a significant risk that he should have

the prison official acted "maliciously and sadistically for the very purpose of causing harm ...." *Farmer,* 511 U.S. at 836, 114 S.Ct. 1970 (quoting *Hudson v. McMillian,* 503 U.S. 1, 6, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). This is not a case like *Hudson.*

Therefore, the deliberate indifference standard, and not the malicious standard, of liability applies to Plaintiffs' due process/Eighth Amendment claims. *See Berry,* 900 F.2d at 1495; and *MacKay v. Farnsworth,* 48 F.3d 491, 493 (10th Cir.1995).

perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment." *Id.* at 838, 114 S.Ct. 1970. The Court held, therefore, that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.*

■ The Supreme Court made it clear that even though it was adopting a subjective definition of recklessness, an official's subjective knowledge can be proven by drawing inferences from all available evidence, including objective facts. For instance, a fact finder could conclude that a prison official actually knew of a substantial risk from the fact that the risk was obvious. *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970.

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842–43, 114 S.Ct. 1970 (quotation omitted).

■ Because a prison official's actual, subjective awareness of a substantial risk is to be determined from all available evidence, a plaintiff's failure to give prior notice that he was facing a risk of harm is not dispositive. Thus, in *Farmer*, the plaintiff's failure to express any concern for his safety to the defendants was not dispositive. *Farmer*, 511 U.S. at 848, 114 S.Ct. 1970. Advance notice from a plaintiff might be sufficient to establish a prison official's subjective awareness of a substantial risk of harm, but it is not required. A plaintiff may establish the official's subjective awareness by relying on any relevant evidence. *Id.*

■ The Supreme Court was also quick to point out that a prison official need not know that harm would actually befall a particular inmate. The Eighth Amendment is violated by allowing a substantial risk to safety to exist, regardless of whether harm actually befalls an inmate.[9] Consequently, a prison official cannot escape liability by showing that "while he was aware of an obvious, substantial risk to inmate safety, he did not know that the [plaintiff] was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843 and 849 n. 10, 114 S.Ct. 1970. It is enough that the official fails to take reasonable steps to alleviate a substantial risk once he is actually aware of it. If a prison official is aware of a substantial risk of harm, it is irrelevant to liability that the official could not guess beforehand precisely who would attack whom. *Id.* at 843–44, 114 S.Ct. 1970.

■ If a prison official is actually aware of a substantial risk of harm, he must respond reasonably to the risk. That is, a prison official's duty under the Eighth Amendment is to ensure reasonable safety, a "standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.' " *Farmer*, 511 U.S. at 845–46, 114 S.Ct. 1970 (quoting

9. Whether a plaintiff suffered actual harm is relevant, however, to the type of relief to which the plaintiff is entitled. If actual harm has not been suffered, injunctive relief to eliminate the substantial risk to safety may be appropriate, but money damages would not. *See Farmer*, 511 U.S. at 845–47, 114 S.Ct. 1970. Money damages would only be appropriate where the plaintiff actually suffered harm.

*Spain v. Procunier,* 600 F.2d 189, 193 (9th Cir.1979)). A prison official cannot be held liable, therefore, if he responded reasonably to the risk, even if harm to an inmate was not ultimately averted. *Id.* at 845, 114 S.Ct. 1970. "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847, 114 S.Ct. 1970. *See also Mitchell v. Maynard,* 80 F.3d 1433, 1442 (10th Cir.1996).

 The deliberate indifference standard of liability for individual prison officials also carries with it a general causation requirement. Prison officials are only responsible for their own constitutional violations. One is not generally responsible for the constitutional violations of others. Consequently, liability under § 1983 cannot rest upon a theory of *respondeat superior.* A sheriff is not liable for the misconduct of a prison guard which reports to him unless there is an "affirmative link" between the constitutional violation allegedly committed by the guard and the sheriff's own conduct. *Meade v. Grubbs,* 841 F.2d 1512, 1527–28 (10th Cir. 1988). An affirmative link can be demonstrated if the sheriff (1) actually participates in the deprivation of an inmate's constitutional right, (2) acquiesces in the guard's deprivation of an inmate's constitutional right, or (3) establishes or utilizes a policy or custom which authorizes or permits the guard to deprive an inmate of his constitutional rights. *Id. See also Mitchell,* 80 F.3d at 1441.

In connection with their failure to protect claim, Plaintiffs are not attempting to hold Sheriff Glanz liable for the actions of a particular guard or guards in the Jail. Rather, they are attempting to hold Sheriff Glanz personally liable for the conditions which he allegedly allowed to exist in the Jail—conditions which Plaintiffs believe created the risk that Mr. Winton would be assaulted in the first place. Sheriff Glanz' failure to take reasonable steps to abate a known risk of attack is sufficient to satisfy § 1983's affirmative link requirement because Plaintiffs are attempting to hold Sheriff Glanz liable for his own failure to act, not someone else's failure to act. Based on the authorities discussed in this section, Plaintiffs must establish the following to hold Sheriff Glanz personally liable on their failure to protect claim: (1) that Sheriff Glanz was actually aware of a serious risk of attack by fellow inmates at the time Mr. Winton was incarcerated in the Jail, and (2) that Sheriff Glanz disregarded the risk by failing to take reasonable measures to abate the risk.

In connection with their failure to provide medical care claim, Plaintiffs are in effect attempting to hold Sheriff Glanz liable for his guard's failure to recognize that Mr. Winton needed medical attention, and their delay in obtaining medical attention for Mr. Winton after the September 18th attack. Plaintiff must, therefore, establish some affirmative link between Sheriff Glanz and the guard's delay in obtaining medical assistance for Mr. Winton. To hold Sheriff Glanz personally liable on their failure to provide medical care claim, Plaintiffs must establish: (1) that the detention officer on duty was actually aware of Mr. Winton's serious injuries, (2) that the detention officer on duty failed to take reasonable steps in obtaining medical assistance for Mr. Winton, and (3) that Sheriff Glanz had established a policy or custom which authorized or permitted the detention officer to act as he did.[10] *See*

---

**10.** There is no evidence in the record that Sheriff Glanz was in any way personally involved with or made any direct decision in connection with Mr. Winton's need for medical care on September 18th. There is also no evidence in the record that Sheriff Glanz was aware of and acquiesced in the detention officer's actions on September 18th. Thus, to satisfy § 1983's affirmative link requirement, Plaintiffs must show that Sheriff Glanz established a policy or custom which authorized or permitted the detention officer to act as he did on September 18th.

*Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir.1999).

### 2. As Applied to the County

▮ The deliberate indifference standard discussed above for individuals is the same standard to be applied to the County on Plaintiffs' denial of medical care and failure to protect claims. The standard is, however, applied differently to governmental entities in two very significant respects. First, the causation standard for governmental entities is articulated differently. Second, as applied to an individual prison official, *Farmer* instructs that the deliberate indifference standard is a subjective standard requiring actual knowledge of a risk by the official. In the governmental liability context, however, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the governmental entity should have known of it. *Barney v. Pulsipher,* 143 F.3d 1299, 1308 n. 5 (10th Cir.1998); *Farmer,* 511 U.S. at 840–42, 114 S.Ct. 1970 (discussing *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

▮ A governmental entity cannot absolutely guarantee the safety of those it incarcerates. Nevertheless, governmental entities have a constitutional duty under the Eighth Amendment to take reasonable steps to protect a prisoner's safety and bodily integrity. *Berry,* 900 F.2d at 1499. Governmental entities are not, however, generally responsible for constitutional violations committed by its agents or employees. Again, there is no *respondent superior* liability under § 1983. For a governmental entity to be liable under § 1983, "it must have caused the harm through the execution of its own policy or custom by those whose edicts or acts may fairly be said to represent official policy." *Meade,* 841 F.2d at 1529. By focusing on a policy or custom, the Court ensures that the governmental entity "is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the [governmental entity]." *Board of County Commissioners v. Brown,* 520 U.S. 397, 403–404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Thus, to hold a governmental entity liable under § 1983, a plaintiff must establish that (1) he has been deprived of a constitutionally protected right, and (2) that a governmental policy or custom was the moving force behind the constitutional deprivation. *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *City of Canton,* 489 U.S. at 385, 109 S.Ct. 1197; *Myers v. Oklahoma County Board of County Commissioners,* 151 F.3d 1313, 1317 (10th Cir.1998).

Those whose edicts can fairly be said to bind a governmental entity are those officials who are responsible for establishing final policy on a given subject matter. An act by a final policymaker is an act of official government "policy" as that term is commonly understood. Defendants do not deny that Sheriff Glanz was the final policymaker for the County with regard to how the Jail was to be operated on a day to day basis.[11] Thus, there can be no dispute that for purposes of liability under § 1983, the actions of Sheriff Glanz are also the official actions/policy of the County with respect to Jail operations. *See Myers,* 151 F.3d at 1319; *Meade,* 841 F.2d at 1529–30; and *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

When a governmental entity enacts a policy which itself violates federal law, issues of culpability and causation are straightforward. Proving the mere existence of the unlawful policy ends the inquiry. *Brown,* 520 U.S. at 404–406, 117 S.Ct.

---

11. Under Oklahoma law, the County has no statutory duty to hire, train, supervise or discipline county sheriffs or their deputies. Counties are, however, required to inspect jails at least once a year to examine jail conditions. 57 Okla. Stat. § 1. Nevertheless, in Oklahoma the sheriff is ultimately responsible for the proper management of the jail in his county and the conduct of his deputies. *Meade,* 841 F.2d at 1528 (citing 19 Okla. Stat. § 513 and 547(A)). *See also* 57 Okla. Stat. §§ 47, 52 and 54.

1382. If the policy at issue is not unlawful on its face, determining culpability and causation is more problematic, because it is less clear that the governmental entity has directly inflicted injury. In *Brown,* the Supreme Court held that in situations where the policy at issue is not unlawful on its face, "rigorous standards of culpability and causation must be applied to ensure that the [governmental entity] is not held liable solely for the actions of its employee." *Id.* at 405, 117 S.Ct. 1382.

There is no evidence that the County maintains an official policy which permits inmates to attack each other or which permits detention officers to deny inmates necessary medical care. There is also no evidence that Sheriff Glanz authorized Mr. Winton's assault or the alleged delay in the treatment of Mr. Winton's injuries. Rather, Plaintiffs argue that the County and Sheriff Glanz are liable for permitting conditions to exist at the Jail which precipitated the attack on Mr. Winton and for failure to adequately train and supervise the detention officers on duty. Accordingly, this case falls in that category of cases in which the Supreme Court has mandated that rigorous standards of culpability and causation be applied. *See, e.g., Barney,* 143 F.3d at 1307.

The deliberate indifference standard may be satisfied when a governmental entity has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. *Brown,* 520 U.S. at 407–408, 117 S.Ct. 1382. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. *Id.* In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a governmental entity's action or inaction, such as when a governmental entity fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for consti-

tutional violations. *Brown,* 520 U.S. at 409–10, 117 S.Ct. 1382; *Canton,* 489 U.S. at 390 & n. 10, 109 S.Ct. 1197.

Based on the authorities discussed in this section, Plaintiffs must establish the following to hold the County liable on their failure to protect claim: (1) that the County or Sheriff Glanz was actually aware, or should have been aware, of a serious risk of attack by fellow inmates at the time Mr. Winton was incarcerated in the Jail; (2) that the County or Sheriff Glanz disregarded the risk by failing to take reasonable measures to abate the risk; and (3) that the County's or Sheriff Glanz' failure to act was the moving force (i.e., cause in fact) behind Mr. Winton's injuries. Plaintiffs may establish that the County was aware of the risk of inmate violence by showing either a pattern of violence at the Jail or by showing that inmate-on-inmate violence was a "highly predictable" or "plainly obvious" consequence of the County's action or inaction.

Based on the authorities discussed in this section, Plaintiffs must establish the following to hold the County liable on their failure to provide medical care claim: (1) that the detention officer on duty was actually aware, or should have been aware, of Mr. Winton's serious injuries, (2) that the detention officer on duty failed to take reasonable steps in obtaining medical assistance for Mr. Winton, and (3) that a policy or custom established by the County or Sheriff Glanz was the moving force behind (i.e., cause in fact) the detention officer's failure to provide Mr. Winton with timely medical care.

**D. APPLICATION OF THE DELIBERATE INDIFFERENCE STANDARD TO THIS CASE**

**1. Failure to Protect from Harm**

**a. *Sheriff Glanz' Individual Liability***

Plaintiffs allege that at the time Mr. Winton was incarcerated in the Jail the following conditions at the Jail created or significantly increased the risk of inmate violence at the Jail: overcrowding,

inadequate Jail staff and an outmoded physical structure which prevented adequate supervision of inmates, an inadequate inmate classification/tracking system, inadequate supervision and training of Jail staff, inadequate segregation of offending inmates, and failure to install or use electronic monitoring devices. Plaintiffs allege that Sheriff Glanz was aware of these conditions, and the risk of harm they created, but was deliberately indifferent to the risk of harm created by these various conditions.

In 1994 (prior to Mr. Winton's assault), the DOJ inspected the Jail and reported that the conditions at the Jail were unconstitutional for several reasons. In particular, the DOJ found that the Jail failed to provide a reasonably safe environment and that it exposed inmates to a very serious risk of violence. Doc. No. 31, Exhibit "2," p. 2. The DOJ's expert penologist, Eugene Miller, stated in his 1994 report that the Jail was a war zone and a battleground with an unreasonable level of serious violence. *Id.* at Exhibit "3," pp. 7 and 19. Mr. Miller toured the Jail in 1997 and again found the violence and risk of harm to be unacceptably high. Doc. No. 32, Exhibit "E," p. 11. *See also* Doc. No. 52, Exhibit "11" (Bogard Audit); and Doc. No. 31, Exhibit "5," pp. 18, 23 and 58 (Sheriff Glanz' deposition). The Court finds this evidence is sufficient to permit a jury to conclude that Sheriff Glanz was actually aware of a serious risk of harm to inmate safety at the Jail. Thus, Plaintiffs have presented evidence sufficient to satisfy the subjective awareness element of deliberate indifference required by *Farmer*.

Sheriff Glanz attempts to distinguish *Farmer* by arguing that liability for failure to protect an inmate from harm has only been imposed when a prison official knew one of the following: (1) that the inmate was subject to a particularized risk of harm individually because of some personal trait he possesses, (2) that the inmate committing the assault was unusually violent or otherwise likely to assault another inmate, or (3) because of other facts that a specific assault was about to occur. Sher-

iff Glanz argues that this case does not fit into any of these "traditional" categories in which liability has been imposed. Plaintiffs' argument in response is twofold. First, Plaintiffs argue that there is some evidence in the record that this case does fit into category one or two. Second, Plaintiffs argue that Sheriff Glanz reads *Farmer* too narrowly.

There is some evidence in the record from which a jury could conclude that the way in which the detention officer on duty handled Mr. Winton's complaint about food theft singled Mr. Winton out as a snitch, worthy of retaliation. There is, therefore, at least some evidence that Mr. Winton was subjected to a particularized risk of harm. There is also some evidence that the inmates who ultimately beat Mr. Winton had the day before been responsible for assaulting another white inmate in another cell. There is some evidence that the detention officers moved the inmates that beat Mr. Winton into Mr. Winton's cell to stop the assaults they were committing in their prior cells. There is, therefore, at least some evidence that the guards were aware that the inmates that assaulted Mr. Winton were prone to violence and likely to assault white inmates like Mr. Winton.

Plaintiffs are attempting to hold Sheriff Glanz liable, as the detention officer's supervisor, for the detention officers' disregard of the alleged particularized risks. There is, however, no evidence to establish that Sheriff Glanz was in fact aware of a particularized risk to Mr. Winton or that he was aware of the particularized risk created by the inmates that ultimately beat Mr. Winton. Sheriff Glanz can be liable under § 1983 only for his own conduct. If Plaintiffs want to hold Sheriff Glanz liable for the detention officer's failures, Plaintiffs must present some evidence which establishes an affirmative link between some conduct of Sheriff Glanz as the detention officers' supervisor and the detention officer's disregard of the particularized risks which Plaintiffs allege.

Plaintiffs do not directly address the affirmative link requirement in this context. Plaintiffs do argue generally, however, that Sheriff Glanz failed to establish a classification and segregation system, and that Sheriff Glanz failed to adequately train officers on how to confidentially process grievances. The Court agrees that there is some evidence in the record establishing that Sheriff Glanz had not established a classification system which, beyond the selection of where an inmate would be initially housed, tracked an inmates' history of violence and/or rules infractions while at the Jail. There is also evidence that Sheriff Glanz had not established an adequate system of segregation at the Jail. Violent inmates who attacked other inmates were not routinely segregated away from the general population. Rather, they were just placed in another cell with other unsuspecting inmates. There is, therefore, at least some evidence from which a jury could conclude that Sheriff Glanz' failure to implement an adequate classification and segregation system lead the detention officers to disregard the risk posed by the inmates that ultimately beat Mr. Winton.

There is also some evidence that there was a failure to train detention officers on how to process grievances without branding an inmate as a snitch. There is at least some evidence from which a jury could conclude that because of their lack of training the detention officer's disregarded the risk of branding Mr. Winton as a snitch worthy of retaliation. The Court agrees with Plaintiffs, therefore, that there is at least some evidence that would place this case within some of the "traditional" categories of liability identified by Sheriff Glanz.

The Court also agrees with Plaintiffs that Sheriff Glanz reads *Farmer* too narrowly. The Sheriff is not required to be aware of a particularized risk posed by or to an inmate, or that a particular assault is likely. *Farmer* imposes liability in the absence of any particularized knowledge when there is evidence that "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the ... official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Farmer*, 511 U.S. at 842–43, 114 S.Ct. 1970. The Court finds that there is some evidence from which a jury in this case could conclude that there has been a longstanding, pervasive and well-documented risk of inmate attacks at the Jail. Knowledge of this risk alone is sufficient under *Farmer*.[12] The Court finds that there is some evidence that an unreasonable level of violence has existed at the Jail for at least the last 10 years. It is knowledge of this pervasive risk alone which gives rise to Sheriff Glanz' duty to take reasonable steps to abate the risk.

The Court recognizes the unenviable position of Sheriff Glanz. The Court is also sensitive to the fact that Sheriff Glanz is often hampered in his good faith efforts to address Jail issues by the lack of funding from the County. As the Tenth Circuit has recognized, if a sheriff's efforts to correct jail deficiencies which create a substantial risk of harm to inmates are hindered by a lack of funds the sheriff could not be found individually liable because his failure to abate the risk of harm cannot be said to be deliberate. *Lopez*, 172 F.3d at 762 n. 4. The sheriff need only show that

---

**12.** Defendants argue at length in their original summary judgment briefs that Mr. Winton did not have a constitutional right to be housed in any particular facility or with, or away from, any particular inmate. Defendants may be correct, but their characterization of Plaintiffs' claims is disingenuous in light of Plaintiffs' continual reliance on *Farmer*. After *Farmer*, there is no question that Mr. Winton had a constitutional right to be

free from a serious risk of harm to his safety while incarcerated at the Jail. It is this constitutional right, and not a right to be housed in a particular cell, which Mr. Winton is asserting. Viewed in this context, the cell in which Mr. Winton or his attackers were housed becomes relevant to the extent that cell movement and classification of inmates would be a reasonable response to abate the risk of harm prohibited by *Farmer*.

the monetary restraints imposed by the County frustrated his good faith efforts to correct the conditions creating the substantial risk of harm. *Id.* Like the sheriff in *Lopez*, Sheriff Glanz does not move for summary judgment on this basis. Rather, Sheriff Glanz argues that the actions which he did take were sufficient to discharge his constitutional duty under *Farmer.*

Sheriff Glanz argues that Plaintiffs have no evidence to establish the second element of *Farmer*—that he disregarded a serous risk of harm to inmate safety by failing to take reasonable steps to abate the risk. Sheriff Glanz argues that he was not deliberately indifferent to the risk of harm to inmates because he took the following steps to abate the risk of harm: he supported a sales tax increase to build a new jail, he established an overcrowding committee, at one time he set up tents to help with overcrowding, he knocked down day rooms at the Jail and added additional beds to ease overcrowding, he established an inmate classification unit, he established a H.O.T. extraction team, he established a cadet training program, and he established a gang intervention team. With his motion for summary judgment, Sheriff Glanz is asking the Court to find that these steps were, as a matter of law, a reasonable response to the risk of harm to inmate safety (i.e., that no reasonable juror could find that Sheriff Glanz did not respond reasonably).

The Court finds that there is evidence in the record from which a jury could conclude that the measures taken by Sheriff Glanz were not reasonably calculated to ensure the safety of inmates in the Jail or reduce the level of violence in the Jail. For instance, as Plaintiffs point out, supporting a bond election does nothing for the inmates in the Jail who are plagued daily by an omnipresent threat of violence. There is also some evidence in the record that the overcrowding committee established by Sheriff Glanz was ineffective, and in any event the jail remained overcrowded at the time of Mr. Winton's assault. There is also evidence that at the time of Mr. Winton's attack, the classification system to which Sheriff Glanz alludes stopped at the front door of the Jail. That is, the classification system was used only to determine at which of the three facilities in the County an inmate would initially be housed (i.e., the Jail, the Adult Detention Center or the Tulsa City Jail). The classification system did not protect inmates in the Jail from inmates who, once they were assigned to the Jail, began committing violence against other inmates. The H.O.T. (Hazardous Operations Team) also did not protect inmates from harm. The team was used only after an altercation which could not be brought under control had already begun. It often took a long time to assemble the team members and for the team to respond. Often, the team was used only to extricate an inmate who had already been beaten. There is no evidence in the record of how it is that the gang intervention unit or the cadet training program reduced the incidence of violence at the Jail. There is also some evidence that the knocking down of the day rooms increased the risk of violence, not abated it, due to the increase of inmate idleness and the lack of inmate access to exercise.[13] A reasonable jury could conclude, therefore, that the steps taken by the Sheriff were not reasonable in light of the significant risk of inmate violence at the Jail.

---

**13.** This is particularly true in light of the evidence which suggests that due to the violent nature of the inmates at the Jail, cellular and not dormitory-style confinement is necessary. Placing violent criminals together in a large, open barracks, rather than in ones or twos in a single cell, is clearly at odds with the opinions expressed by the experts whose opinions are in the record. A jury could conclude, therefore, that the addition of more dormitory-style housing at the Jail was not reasonable. Of course, the Sheriff could argue that by creating additional bed space, he was reducing the amount of overcrowding, and the risks presented by use of dormitory-style housing were offset by the reduction in risk due to the reduction in overcrowding. It is, however, up to the jury to strike these fine balances.

Sheriff Glanz argues that Plaintiffs have presented no evidence which establishes that the conditions like overcrowding, under-staffing, lack of supervision of inmates, poor design of the jail, or any of the other conditions identified by Plaintiffs caused Mr. Winton's injuries. The Sheriff argues that no reasonable jury could conclude that the conditions identified by Plaintiffs contributed to or caused Mr. Winton's harm. The Court does not agree. There is at least some evidence in the record from which a jury could conclude that the conditions identified by Plaintiffs did in fact create or contribute to the epidemic of violence in the Jail. For instance, the DOJ found that the Jail had a very serious problem with violence and that it failed to provide a reasonably safe environment. The DOJ and its expert penologist pointed to several factors which made the Jail an unreasonably dangerous place. In particular, they pointed to the fact that there was an inadequate classification/tracking system for inmate violence, and to the fact that the Jail was overcrowded, understaffed, poorly designed and poorly supervised. Doc. No. 31, Exhibit "2," pp. 2–5 and Exhibit "3."

Plaintiffs have presented evidence from which a jury could conclude that Sheriff Glanz was actually aware of a significant risk of harm to inmate safety at the Jail and that Sheriff Glanz failed to take reasonable steps to abate the risk. Plaintiffs have, therefore, presented evidence from which a jury could conclude that Sheriff Glanz was deliberately indifferent. Consequently, Plaintiffs survive summary judgment on the second element of their Second Claim against Sheriff Glanz individually.

#### i. Sheriff Glanz' Qualified Immunity

■ A public official performing a discretionary function is entitled to qualified immunity in a civil action for damages, provided his conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court must first determine, as a matter of law, whether the plaintiff has alleged the violation of a clearly established constitutional right. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Then, "the defendant must demonstrate no material issues of fact remain about the objective reasonableness of his or her action in light of the law and the information he or she possessed at the time." *Howard v. Dickerson,* 34 F.3d 978, 981 (10th Cir.1994).

■ Plaintiffs allege that Mr. Winton had a constitutional right to be free from a serious risk of harm while incarcerated at the Jail. Such a right was clearly established by the United States Supreme Court in *Farmer* on June 6, 1994, more than a year before Mr. Winton's beating. The right Plaintiffs allege was, therefore, clearly established at the time of his beating. The Court has already found that there are genuine issue of fact regarding the reasonableness of Sheriff's Glanz actions to abate the serious risk of harm at the Jail. Sheriff Glanz is, therefore, not entitled to qualified immunity on Plaintiffs' First Claim.

#### b. The County's Liability

■ The County does not deny that it was aware that a significant risk to inmate safety existed at the Jail during the time Mr. Winton was incarcerated there. For the same reasons that the Sheriff was aware of the risk (i.e., DOJ investigation, etc.), the County was aware of the risk. The County was also aware of the risk because the Sheriff, a final policymaker with respect to Jail administration, was aware of the risk. The Court finds, therefore, that Plaintiffs have presented evidence sufficient to satisfy the awareness of risk element of deliberate indifference required by *Farmer, Harris* and *Brown.*

As did Sheriff Glanz, the County argues that the actions which it, and Sheriff Glanz, took were sufficient to discharge its constitutional duty to provide inmates with a reasonably safe environment. The County argues that there is no evidence

that it disregarded a serous risk of harm to inmate safety by failing to take reasonable steps to abate the risk. In fact, the County argues that it is undisputed that it acted reasonably to improve conditions at the Jail.

The County cannot avoid trial based solely on the Sheriff's actions to abate the serious risk of harm at the Jail. As discussed above, there are questions of fact for the jury regarding the reasonableness of the Sheriff's actions in response to the pervasive risk of harm at the Jail. In addition to the actions of Sheriff Glanz, the County argues that the Court should find its actions reasonable as a matter of law because it took the following additional steps to correct the conditions at the Jail: (1) it hired John Milosovich, a jail consultant; (2) it cooperated fully with the DOJ and signed a settlement order with the DOJ agreeing to improve conditions at the Jail; (3) it nearly doubled the Jail's budget from 1993–1997; and (4) it initiated and lead the effort to get a sales tax initiative passed to build a new jail.

The Court finds that there is evidence in the record from which a reasonable jury could conclude that the County's action or inaction in response to the risk of harm present in the Jail was not reasonable. The new jail tax was disapproved by the County voters several times before it was actually approved in September 1995. Thus, the County's support of a new jail tax did nothing to improve the conditions Mr. Winton experienced while he was incarcerated. The County did sign a settlement order with the DOJ, but as the DOJ's expert stated after his 1997 visit to the Jail, the Jail was still an unreasonably dangerous place, subjecting its inmates to a serious risk of harm. From this evidence, a jury could conclude that the County's actions were not reasonable in light of the pervasive and long-standing risk of violence at the Jail.

There is evidence in the record from which a jury could conclude that the only practical way for the County to have significantly abated the risk of violence at the

Jail was to build a new facility. There is also evidence in the record that the County was hampered in its efforts to build a new jail by the voters of Tulsa County, who refused to pass bond issues prior to September 1995. While the Court recognizes the plight of the County, "[t]he lack of funding is no excuse for depriving inmates of their constitutional rights." *Ramos,* 639 F.2d at 573, n. 19 (citing several cases). The voters of Tulsa County had a choice. The County could pay on the front end to protect the constitutional rights of inmates by building a new jail, or the County could pay on the back end by satisfying judgments in meritorious civil rights actions based on unconstitutional conditions at the Jail. Until a new jail was built in 1999, the voters in Tulsa County had necessarily chosen the second of these options as the County's response to violence at the Jail.

The County argues that Plaintiffs have presented no causation evidence. That is, the County argues that Plaintiffs cannot establish that any policy or custom of the County was the moving force behind Mr. Winton's injuries. The Court does not agree. A county policy can be a policy of inaction or ineffective action. A reasonable jury could find that the County's inaction or ineffective action was the moving force behind the conditions at the Jail which caused or permitted a serious risk of inmate harm to exist in the Jail. A jury could find that overcrowding, under-staffing, lack of adequate inmate supervision, lack of inmate segregation and classification, lack of inmate exercise time, dormitory-style housing, all of which existed over a long period of time, were all *de facto* policies of inaction by the County which created and or contributed to the conditions which created a serious risk of harm in the Jail.

Plaintiffs have presented evidence from which a jury could conclude that the County was actually aware of a significant risk of harm to inmate safety at the Jail, that the County failed to take reasonable steps to abate the risk, and that the County's

policy of no or ineffective action was the moving force behind the conditions which created the risk of harm in the first place. Plaintiffs have, therefore, presented evidence from which a jury could conclude that the County was deliberately indifferent. Consequently, Plaintiffs survive summary judgment on the second element of their Second Claim against the County.

### 2. Denial of Medical Care

#### a. Sheriff Glanz' Individual Liability

 Sheriff Glanz argues that it is undisputed that the detention officers on duty took Mr. Winton to the nurse immediately after they discovered that he was injured. Sheriff Glanz argues, therefore, that there was no deliberate indifference with regard to Mr. Winton's medical needs. The facts surrounding Mr. Winton's medical care are not, however, undisputed.

There is an affidavit from Mr. Winton and a declaration by Jerry Wayne Priest in the record. Doc. No. 31, Exhibit "1;" and Doc. No. 53, Exhibit "13." Mr. Winton alleges that he called out for help several times and asked a passing detention officer for help during the night. Mr. Priest, a fellow inmate in Mr. Winton's cell on the night of the attack, alleges that he himself asked guards on several occasions during the night to help Mr. Winton. No guard helped Mr. Winton during the evening. Mr. Winton was not taken to the nurse until 7:30 a.m., some seven hours after he alleges the attack occurred. Defendants present the affidavit of another fellow inmate, Charles Ingram, who alleges that guards made their regular rounds, but no one told the guards that anyone was hurt. Doc. No. 32, Exhibit "D." If these three affidavits do not create a genuine issue of fact for the jury as to whether the guards responded immediately or not, then the Court does not know what would.

If in fact the detention officers on duty were aware of Mr. Winton's medical needs and if in fact they did delay in providing medical treatment to Mr. Winton, Plaintiffs still must show that Sheriff Glanz is individually liable for the officer's conduct.

That is, Plaintiffs must show some affirmative link between Sheriff Glanz' conduct and the officer's delay in taking Mr. Winton to the nurse for treatment. Plaintiffs allege without any specificity that the Sheriff failed to implement adequate medical screening policies that would have resulted in the identification of Mr. Winton's injuries in a timely fashion. Doc. No. 2, ¶ 24. Plaintiff presents no evidence, however, of what the existing medical policies were at the Jail or what additional policies the Sheriff should have enacted to ensure the timely discovery of injuries like Mr. Winton's.

There is some evidence that Sheriff Glanz maintained or permitted an inadequate watch tour policy. There is some evidence that, due in part to the overcrowding, under-staffing, and the dormitory-style housing at the Jail, detention guards were not conducting adequate head counts on their watch tours. Doc. No. 53, Exhibit "11," p. 8. Detention officers were not doing head counts based on the moving, breathing flesh of inmates. Rather, they were taking the word of other inmates, or simply looking into a dorm without doing an individual head count. This policy could result in a detention officer failing to timely discover an injured inmate. A jury could, therefore, find an affirmative link between the Sheriff's maintenance or acquiescence in an inadequate watch tour policy and the delay in discovering Mr. Winton's injuries.

Plaintiffs have presented sufficient evidence to survive summary judgment on the second element of their First Claim against Sheriff Glanz individually.

#### i. Sheriff Glanz' Qualified Immunity

 Plaintiffs allege that Mr. Winton had a constitutional right to adequate medical care while incarcerated at the Jail. Such a right was clearly established by the United States Supreme Court in 1976 in *Estelle*, many years before Mr. Winton's beating. The right Plaintiffs allege was, therefore, clearly established at the time of his beating. There are genuine issues of

fact regarding the reasonableness of Sheriff Glanz' actions in connection with Mr. Winton's need for medical care. Sheriff Glanz is, therefore, not entitled to qualified immunity on Plaintiffs' First Claim.

### b. *County's Liability*

The County argues there is no evidence of causation. That is, the County argues that there is no evidence that any of its own customs or policies were the moving force behind the denial of timely medical care to Mr. Winton. The Court does not agree.

 First, the County is potentially liable on Plaintiffs' medical care claim for essentially the same reasons the Sheriff is potentially liable on Plaintiffs' medical care claim. The Sheriff's actions or inactions, as the final policy maker for the Jail, are attributable to the County. Thus, the inadequate tour watch policy established or acquiesced in by the Sheriff is the County's policy as well. Second, as discussed with regard to Plaintiffs' failure to protect claim, a jury could find that overcrowding, under-staffing, and dormitory-style housing, all of which existed over a long period of time, were *de facto* policies of inaction by the County. A jury could also determine that it is these *de facto* policies of inaction which resulted in an inadequate watch tour policy.

Plaintiffs have presented sufficient evidence to survive summary judgment on the second element of their First Claim against the County.

### CONCLUSION

Defendants' motions for summary judgment are granted in part and denied in part. [Doc. No. 21]. Plaintiffs' Fifth Claim for Relief based on Mrs. Winton's alleged loss of consortium is dismissed. Mrs. Winton may not recover any damages under § 1983 for the alleged violation of her husband's constitutional rights and she has not alleged the violation of a constitutional right personal to her. Defendants' motions for summary judgment are granted as to the Fifth Claim for Relief.

Plaintiffs have presented sufficient evidence to raise material questions of fact in connection with their First and Second Claims for Relief based on Defendants' alleged failure to protect Mr. Winton from harm while incarcerated at the Jail and Defendants' alleged failure to provide adequate medical care. Defendants' motions for summary judgment are denied as to the First and Second Claims for Relief.