FILED
United States Court of Appeals
Tenth Circuit

April 21, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GINGER MARTINEZ, individually
and as Personal Representative of the
Estate of Kenneth Wayne Ginn,

     Plaintiff-Appellant,

v.

DeWAYNE BEGGS, as Sheriff of
Cleveland County; DAVID EPPS,
KEVIN BRANDON; CLEVELAND
COUNTY BOARD OF COUNTY
COMMISSIONERS; TOMMY
EDWARDS; GILBERT KIRKLAND,

     Defendants-Appellees.

No. 08-6042

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:CV-07-132-F)**

---

T. David Hasbrook of Hasbrook & Hasbrook, Oklahoma City, Oklahoma, for
Plaintiff-Appellant.

David W. Lee (with Ambre C. Gooch on the brief), of Lee & Gooch, P.C.,
Oklahoma City, Oklahoma, for Defendants-Appellees.

---

Before **KELLY, BRISCOE,** and **McCONNELL**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

Plaintiff-Appellant Ginger Martinez, individually and on behalf of the estate of her father, Kenneth Wayne Ginn, filed a 42 U.S.C. § 1983 action against the Board of County Commissioners of Cleveland County Oklahoma, Sheriff DeWayne Beggs, and Deputies Kevin Brandon, Tommy Edwards, David Epps, and Gilbert Kirkland alleging violations of the Fourteenth Amendment to the United States Constitution for deliberate indifference to Ginn's serious medical needs after Ginn died while in police custody.

The district court granted summary judgment in favor of defendants on qualified immunity grounds after concluding that Martinez had failed to show a genuine issue of material fact with respect to the subjective component of deliberate indifference, and, thus, had failed to show a constitutional violation. Martinez appeals. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I

Ginn died on the evening of May 2, 2006, in the Cleveland County Detention Center (the "detention center") in Noble, Oklahoma, a few hours after his arrest for public intoxication. An autopsy conducted after his death revealed that Ginn had a blood alcohol level of 0.32%. According to the medical examiner's report, the cause of death was heart attack, and alcohol may have been a contributing factor.

At 5:16 p.m. on the day of Ginn's death, the police received a call reporting a fight in progress. The fight was outside the home of Teresa Carlson. Three officers responded to the call within a few minutes of one another—defendants Kirkland and Edwards, and Barbara McSwain, who is not a defendant in this case.

Kirkland arrived first and noticed Ginn sitting on the ground in a section of unfinished porch, between two porch runners approximately two feet off the ground.[1] Kirkland did not see how Ginn came to be on the ground, so he asked Ginn if he was alright and if he needed any medical assistance. Ginn said that he was alright and did not need medical assistance. When asked if he had been drinking, Ginn said, "yes." Aplt. App., Vol. I, at 92 ¶ 5 (Aff. of Kirkland, Doc. 49-2). Kirkland noticed that Ginn's speech was slurred, his eyes were bloodshot, and he smelled of alcohol.

Carlson was standing nearby, and she told Kirkland that Ginn was a neighbor who visited often. She also reported that Ginn had fallen and that he had appeared to be knocked out for a short time. She stated that "Ginn had drunk an entire bottle of whiskey," "Ginn seemed to be hallucinating and seeing people trying to get him," and "that [Carlson] thought Ginn needed to go to the doctor."

---

[1] The district court interpreted "porch runners" to be floor joists and concluded that "Mr. Ginn's presence in that position would be reliable evidence from which it could fairly have been inferred by the officers at the scene that Mr. Ginn was intoxicated to the point of not being able to move about without some risk of mishap." Aplt. App., Vol. II, at 465 n.2 (Order at 3 n.2).

Id., Vol. II, at 255-56 ¶ 13 (Aff. of Carlson, Doc. 59-5).  Additionally, Carlson told Kirkland that Ginn tried to fight her daughter.  Carlson told Kirkland that she did not want to press charges; she only wanted Ginn off of her property.

Edwards arrived next, and Kirkland told him what had happened, including that Ginn had drunk a lot of alcohol.  Edwards approached Ginn, who was still in the unfinished porch area, and told him that the police would have to take him home.  Ginn responded by asking Edwards if he wanted to fight and threatening to "kick his ass."  Id., Vol. I, at 101 ¶ 5 (Aff. of Edwards, Doc. 49-4).  According to Carlson, one of the officers asked Ginn if he wanted to go to the hospital and Carlson believes Ginn did not respond.  When Carlson told the officer to call the paramedics, she was told to "shut up and go inside."[2]  Id., Vol. II, at 256 ¶ 16.

McSwain was the last officer to arrive.  Ginn had not moved from the unfinished porch area.  McSwain informed Kirkland and Edwards that she knew Ginn personally and that Ginn was an alcoholic.  McSwain tried to convince Ginn to go home or to let the officers take him home.  McSwain could tell from Ginn's reaction that he recognized her.  Ginn replied that he did not want to go home and again threatened to fight the officers.  The officers then informed Ginn that if he

---

[2] Carlson's affidavit does not identify the speaker of these words. However, because it is more favorable to Martinez, we assume that one of the officers, and not Ginn, told Carlson to "shut up and go inside." See Aplt. App., Vol. II, at 256 ¶ 16 ("I then told the deputy he should call the paramedics.  I was told to 'shut up and go inside.'").

did not leave Carlson's property, they would have no choice but to arrest him for public intoxication. Ginn refused to leave.

Edwards arrested Ginn for public intoxication. Ginn was generally uncooperative during the arrest and would not get up from the ground. According to Edwards, when Edwards reached down to help Ginn up, Ginn took a swing at Edwards and said "don't touch me." Id., Vol. I, at 102 ¶ 7. After Ginn was handcuffed near the porch area, "Ginn was unsteady on his feet, but he walked entirely on his own two feet and [Edwards and Kirkland] did not carry him." Id. ¶ 8. According to Carlson and her daughter, Misty Fisher, the officers picked Ginn up and dragged him to the patrol car. The arrest affidavit, signed by Edwards, reported that Ginn "was unable to stand." Id., Vol. II, at 253. Kirkland transported Ginn to the detention center.

Before the officers left, Carlson saw Ginn slumped over in the back seat of the patrol car, and she worried that he had passed out. Kirkland stated that Ginn was awake for the beginning of the ride, sitting upright and complaining about the handcuffs being too tight. Kirkland suggested that Ginn lie down to relieve the pressure on his wrists, and Ginn did as suggested. Kirkland thought Ginn "had passed out, like most of your drunks do," id., Vol. II, at 231:15-16 (Dep. of Kirkland, Doc. 59-2), but Ginn was awake when they arrived at the detention center. The drive took approximately fifteen to twenty minutes.

The officers did not administer a breath analyzer test or blood alcohol test

5

to Ginn. According to McSwain, such tests are only administered to suspects arrested for drunk driving offenses, and not to suspects arrested for public intoxication. The rationale for administering a breath analyzer test for drunk driving and not for public intoxication is that Oklahoma law does not require evidence of a person's blood/alcohol concentration to establish public intoxication.

At approximately 6:30 p.m.,[3] Kirkland and Ginn arrived at the detention center. Brandon helped remove Ginn from the car and helped him to a receiving cell. Video surveillance from the detention center shows Brandon and Epps escorting Ginn down a hallway toward the receiving cell. Ginn could not walk in a straight line and the officers kept him from veering into the hallway walls. The officers helped to support Ginn's weight, but they did not completely carry him.

The detention center manual provides:

> Any inmate who is charged with being under the influence of alcohol or drugs or who has alcohol on his breath at the time of booking should be considered as a possible alcoholic. Inmates requiring detoxification or booked on drug charges will be placed in a holding cell for 4 to 6 hours or until sober and observed a minimum of every 30 minutes. . . .

---

[3] Brandon's affidavit states the time as 7:25 p.m. The Oklahoma State Bureau of Investigation report states that Ginn arrived at the detention center around 6:30 p.m. For purposes of this appeal from the grant of summary judgment, we assume Ginn arrived at 6:30 p.m. since that time is more favorable to Martinez.

> The booking deputy will ask the arresting officer about blood alcohol level of the inmate which would mean referral elsewhere based on a high blood alcohol level. If the blood alcohol level is .30 or more the inmate will not be accepted. If the inmate is unconscious, he will not be accepted. . . .
>
> If an inmate is booked into the facility under borderline conditions the shift Supervisor will ensure that the inmate is checked at least every fifteen minutes.

Id., Vol. II, at 349 (Manual, Doc. 59-14). According to Brandon,

> it is not uncommon for an intoxicated person to be taken directly to receiving, before being formally processed into the [detention center]. This occurs when the intoxicated person is unable, due to his/her intoxication, to answer routine questions asked during processing. So, the intoxicated person is placed in a receiving cell for up to four hours to allow him/her to sober up enough to answer routine processing questions, such as personal history, family contact numbers, and medical information.

Id., Vol. I, at 114 ¶ 5.

After Brandon and Epps took Ginn to the cell, Ginn complied with a request to kneel down so his handcuffs could be removed. Brandon, Epps, and Kirkland last saw Ginn alive and resting his head on his arms on his cell bench.

That evening, both Brandon and Epps were responsible for conducting sight checks of all people housed on the first floor of the detention center, including Ginn. However, no one logged in a sight check of Ginn that evening.

At approximately 9:35 p.m., about three hours after Ginn first arrived at the detention center, Brandon returned to the receiving cell and found Ginn dead,

7

with his body in a kneeling position. Brandon called for back-up, checked vital signs, and attempted life saving procedures, including trying to use an automatic defibrillator. Fire department officials arrived and determined that Ginn was dead.

The medical examiner, Chai Choi, M.D., answered interrogatories on behalf of defendants stating that Ginn's cause of death was "[s]udden heart attack due to coronary artery disease" and that "the death was caused by heart attac[k] rather than acute alcohol intoxication." Id., Vol. I, at 134 (Doc. 49-14). However, the examiner also stated that "I felt that the acute ethanol intoxication would be a participating factor to his death." Id. at 135. When asked if Ginn would have had the heart attack if there were no alcohol in his system, Choi stated, "I do not have an opinion (whether [Ginn] would have experienced the same heart attack without acute ethanol intoxication)." Id.

Plaintiff's expert, Kenneth Desser, M.D., opined that Ginn "died as a result of severe ischemic heart disease,[4] compounded by a toxic blood alcohol level and ventricular hypertrophy."[5] Id., Vol. II, at 388 (Aff. of Desser, Doc. 59-17). Desser stated that "Ginn should have been transported to a medical facility after

---

[4] Severe ischemic heart disease is a "deficiency of blood supply due to obstruction of the circulation to [the heart.]" Taber's Cyclopedic Medical Dictionary 947 (Clayton L. Thomas, ed., 16th ed. 1989).

[5] Ventricular hypertrophy is the "[i]ncreased size and muscular content of the myocardium of the ventricles," or lower chambers in the heart. Taber's, supra note 4, at 870.

8

he was taken into custody by law enforcement officers."[6]  Id.  If Ginn were taken

to a medical facility, Desser states "to a reasonable degree of medical certainty"

that the following would have occurred: the medical facility would have measured

Ginn's blood alcohol level, that level would have exceeded 300 mg/dl, "which is

associated with coma and depressed vital signs"; Ginn would have been kept in

the facility for observation; while under observation Ginn would have

"experienced an acute coronary syndrome and ventricular arrhythmia"; Ginn's

cardiac experiences would have been reversed with medical supervision and

treatment; after treatment, Ginn would have had either coronary bypass surgery or

percutaneous coronary intervention[7]; Ginn would have also been treated with "a

beta blocker, aspirin, heparin, possibly nitroglycerin, oxygen and a statin"; and

that, therefore, "this was a preventable death."  Id.


II

We review the district court's grant of summary judgment de novo,

---

[6] Desser gives no support for why officers "should have" transported Ginn to a hospital.  For example, Desser does not list any observable symptoms Ginn would have displayed due to his intoxication that should have alerted officers to a substantial risk of serious harm.

[7] A percutaneous coronary intervention can be any of a variety of procedures used to alter the structure of the blood vessels that supply blood to the heart muscle, such as the insertion of a stent.  See Taber's, supra note 4, at 101 (defining "angioplasty"), 416 (defining "coronary"), 932 (defining "intervention"), 1356 (defining "percutaneous").

9

applying the same legal standard used by the district court.  <u>Reeves v. Churchich</u>, 484 F.3d 1244, 1250 (10th Cir. 2007).  Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"[W]e review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions."  <u>Medina v. Cram</u>, 252 F.3d 1124, 1128 (10th Cir. 2001).  When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established.  <u>Pearson v. Callahan</u>, 129 S. Ct. 808, 815-16 (2009) (citing <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)).  In <u>Pearson</u>, the Supreme Court held that the court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  <u>Id.</u> at 818.  In this case, because defendants did not violate Ginn's constitutional rights, we need not address whether those rights were clearly established.

Under the Fourteenth Amendment due process clause, "pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates" under the Eighth Amendment.  <u>Garcia v. Salt Lake County</u>, 768 F.2d 303, 307 (10th Cir. 1985).  A claim for inadequate

10

medical attention will be successful if the plaintiff shows "'deliberate indifference to serious medical needs.'" Estate of Hocker v. Walsh, 22 F.3d 995, 998 (10th Cir. 1995) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The Supreme Court cautioned that "an inadvertent failure to provide adequate medical care" does not rise to a constitutional violation. Estelle, 429 U.S. at 105-06.

A.     *Objective Component*

The test for deliberate indifference is both objective and subjective. Callahan v. Poppell, 471 F.3d 1155, 1159 (10th Cir. 2006). The objective component of the test is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause" of the Eighth Amendment. Mata v. Saiz, 427 F.3d 745, 752-53 (10th Cir. 2005) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). In Mata, we explained that it is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely "the symptoms presented at the time the prison employee has contact with the prisoner." 427 F.3d at 753.

As to the objective component of the test for deliberate indifference, Martinez simply contends, "Obviously, death satisfies this requirement." Aplt. Br. at 16. Martinez does not claim that intoxication alone is a sufficiently serious harm. We agree with Martinez and the district court that "the ultimate harm to Mr. Ginn, that is, his heart attack and death, w[as], without doubt, sufficiently serious to meet the objective component" necessary to implicate the Fourteenth

11

Amendment.  Aplt. App., Vol. II, at 478 (Order at 16).

B.      *Subjective Component*

Having determined that the selected harm is sufficiently serious to meet the objective component, we "can turn to causation and the subjective prong." Mata, 427 F.3d at 753.  "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." Callahan, 471 F.3d at 1159 (internal quotation marks omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.  Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference.  The question is: "were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" Mata, 427 F.3d at 753.

The factfinder may conclude that a prison official subjectively knew of the substantial risk of harm by circumstantial evidence or "from the very fact that the risk was obvious." Farmer, 511 U.S. at 842.  However, the Supreme Court has cautioned that an obvious risk cannot conclusively establish an inference that the

12

official subjectively knew of the substantial risk of harm, because "a prison official may show that the obvious escaped him." Id. at 843 n.8.

Finally, the subjective component requires the prison official to disregard the risk of harm claimed by the prisoner.[8] Our decision in Estate of Hocker v. Walsh, 22 F.3d 995 (10th Cir. 1994) is instructive. In Hocker, Hocker was placed in a detention center while intoxicated and at times incoherent or "would not wake up." 22 F.3d at 997. Two days later, she was discovered dead in her cell, having hung herself from the upper bunk. Id. Plaintiffs argued that the detention center's policy of admitting intoxicated and unconscious individuals showed deliberate indifference, but that argument was "flawed." Id. at 998. Instead, we concluded that the plaintiffs were required to show that defendants were deliberately indifferent to the specific risk of suicide, and not merely to the risk

_____

[8] Martinez seems to argue that deliberate indifference does not require any connection between the subjective disregard of a risk of serious harm and the objective harm actually claimed. She states that "[a] general awareness of the potential for harm is enough." Aplt. Br. at 26. Martinez cites to Farmer, 511 U.S. at 825, and Winton v. Bd. of Comm'rs of Tulsa County, 88 F. Supp. 2d 1247 (N.D. Okla. 2000) (interpreting Farmer) for support. However, Farmer and Winton are both prisoner assault cases, and the holding in these cases is that the officers need not identify the specific assailant, but need only recognize the substantial risk of the claimed harm—assault. See Farmer, 511 U.S. at 843; Winton, 88 F. Supp. 2d at 1265. As regards the relationship between the disregard of a substantial risk of serious harm and the objective harm claimed, prisoner assault cases like the case at bar still require the officers' subjective disregard of a risk of serious harm, whether the harm is assault, or a heart attack and death. Here, Martinez has not presented evidence to create an issue of material fact regarding the defendants' subjective disregard of Ginn's risk of heart attack or death.

13

of intoxication. Id. at 1000. In the case before us, the defendants must subjectively disregard the risk of Ginn's claimed harm—death and heart attack—and not merely the risks of intoxication.

### 1. *Individual County Defendants*

Martinez contends that the district court erred in concluding that there was no issue of material fact regarding the subjective component of deliberate indifference as to each of the individual county defendants.

Martinez argues that a jury could find that Kirkland and Edwards, the arresting officers, subjectively knew that Ginn faced a substantial risk of serious harm. The arresting officers knew that Ginn consumed an entire bottle of whiskey, he could not walk without help, he may have been unconscious for a short time, he was talking as if he were hallucinating, and Carlson thought he needed medical care. Carlson told the arresting officers that she thought Ginn needed medical care, and they told her to "shut up and go inside."

Martinez additionally argues that a jury could find that the custodial officers, Brandon and Epps, subjectively knew that Ginn faced a substantial risk of serious harm. The custodial officers knew that Ginn was drunk, too incoherent to be booked into jail, had difficulty walking, had not been medically screened, and was left alone in the receiving cell. Policies required the custodial officers to visually check on Ginn, yet the officers failed to log in any sight checks for Ginn between his arrival at 6:30 p.m., and when he was found dead at 9:35 p.m.

14

However, the sufficiently serious objective harm that Ginn faced was heart attack and death, and not acute intoxication. We agree with the district court's determination that there was "no evidence in the record of any symptoms or signs indicating that Mr. Ginn would suffer from a heart attack." Aplt. App., Vol. II, at 479 (Order at 17); see also Aplee. Br. at 32 ("Ginn's only external appearance was that he was intoxicated, and voluntarily so."). Additionally, the district court noted that officers did not know Ginn's blood alcohol level, there was no evidence that Ginn was in pain or distress, and at all times Ginn was conscious and understood that he was being arrested. The officers subjectively knew that Ginn was intoxicated, but there is no evidence to show that anyone would have known that Ginn would face an imminent heart attack or death, much less that the individual county defendants subjectively knew that Ginn was at risk of heart attack or death.

Martinez argues that this case is "very similar" to Garcia v. Salt Lake County, 768 F.2d 303 (10th Cir. 1985). Aplt. Br. at 16. In Garcia, Garcia was arrested for driving under the influence of alcohol after a traffic accident. 768 F.2d at 305. He was transported to the hospital for back pains, where he ingested an overdose of barbiturates and escaped from the hospital. Id. Police found him passed out on the pavement outside the hospital, and a medical doctor, with no knowledge of the barbiturate overdose, declared him semi-conscious. Id. Garcia, still semi-conscious or unconscious, was released from the hospital to be jailed

15

around 3:45 p.m., and officers were told to observe him. Id. There was no physician at the jail "most of the time." Id. at 308. The jail medic instructed that Garcia was to be checked every fifteen to twenty minutes. Id. at 305. Instead, the officers checked Garcia only every thirty minutes. Id. at 305-06. At 8:30 p.m., the medic reexamined Garcia, and he was still unconscious. Id. at 306. When Garcia was checked at 10:15 p.m., he appeared to be dead. Id. Garcia was then transferred to the hospital, monitored on life support, and ultimately life support was discontinued. Id. An expert testified that Garcia would have survived if he had been transported to the hospital when he was examined and determined to be still unconscious at 8:30 p.m. Id. The jury found for the plaintiffs on their 42 U.S.C. § 1983 claim based on the deliberate indifference of the county policy of admitting unconscious persons into the jail and the jail's medical staffing deficiencies, and we affirmed. Id. at 308.

We agree with defendants that the facts of Garcia are distinguishable. Although defendants in Garcia were aware that Garcia was unconscious for many hours, they took no action to attend to his obvious medical needs. By comparison, Ginn was conscious, on his feet, argumentative, and cognizant that he was being arrested. Ginn exhibited "characteristics that are common to many intoxicated individuals." Aplee. Br. at 36. Whereas the practice of admitting to the understaffed jail unconscious individuals suspected of intoxication shows a deliberate indifference to an obvious and substantial risk of serious harm, Ginn

16

was not unconscious and showed no obvious symptoms indicating a risk of serious harm. Nothing in the record indicates that Ginn exhibited symptoms that would predict his imminent heart attack or death.

2.     *Sheriff Beggs and the County*

Martinez contends that Beggs and the county should be held liable for Ginn's death because: (1) county policies and customs showed a deliberate indifference to the serious medical needs of intoxicated detainees, and (2) Beggs failed to adequately train and supervise officers regarding how to handle intoxicated detainees.[9] Martinez asserts her claims against Beggs "in both his individual capacity and his official capacity," Aplt. Br. at 19, but she does not argue that Beggs should be liable for any actions he took on May 2, 2006.[10] Rather, Martinez contends Beggs should be held liable for the actions of the officers he trained and supervised. To the extent Martinez brings a claim against

_____

[9] Specifically, Martinez argues the following theories of liability in her brief, all of which amount to a claim against the county regarding police policies and customs or a failure to train and supervise: (1) the county is liable for any unconstitutional policies implemented by Beggs; (2) the county is liable for Beggs' failure to adequately train the officers; (3) Beggs is liable for his "personal participation" if he knew or should have known he would cause other officers to inflict unconstitutional policies, Aplt. Br. at 23; (4) Beggs is liable under the theory of supervisory liability; (5) Beggs is responsible for the detention center policies; and (6) the county is liable for a pattern of unconstitutional behavior.

[10] Beggs was not present at Carlson's house or at the detention center on May 2, 2006. Therefore, Beggs cannot be liable under a theory that alleges his direct participation in the events leading up to Ginn's death.

17

Beggs in his official capacity, it is the same as bringing a suit against the county. See, e.g., Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998).

A county or sheriff in his official capacity cannot be held "liable for constitutional violations when there was no underlying constitutional violation by any of its officers." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1317-18 (10th Cir. 2002) (internal quotations marks and brackets omitted). "[E]ven if," as Martinez argues, the "policies, training, and supervision [of the individual county defendants] were unconstitutional, the [county] cannot be held liable where, as here, the officers did not commit a constitutional violation." Trigalet v. City of Tulsa, 239 F.3d 1150, 1155-56 (10th Cir. 2001); see also City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

Likewise, Beggs cannot be held liable in his individual capacity for implementing county policies or for the actions of county officers under a theory of supervisory liability, when there was no violation of Ginn's constitutional rights. See Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008) (explaining that supervisory liability requires a constitutional deprivation affirmatively linked to the supervisor's personal participation).

18

As we have concluded that the individual county defendants (Kirkland, Edwards, Brandon, and Epps) did not violate Ginn's constitutional rights, Beggs and the county cannot be held liable as a matter of law.

*3.    County Liability for "Systemic Injury"*

Martinez finally argues that if no single individual county employee is found liable, the county may still be liable for a "systemic injury" caused by "the interactive behavior of several government officials, each of whom may be acting in good faith."  Aplt. Br. at 27 (citing Owen v. City of Independence, 445 U.S. 622, 652 (1980)).  As evidence of a "systemic injury," Martinez outlines the same concerns discussed above regarding lack of officer training and detention center policies (1) to not administer breath analyzer tests to people arrested for public intoxication, and (2) to allow intoxicated detainees to sober up in a cell for four to six hours prior to booking.  To the extent this argument pertains to the county's customs and policies, it has been addressed above.  To the extent this argument suggests that the county can be liable, even if no individual government actor is liable, it is precluded by our prior precedent.  See, e.g., Olsen, 312 F.3d at 1318 ("We will not hold a municipality liable for constitutional violations when there was no underlying constitutional violation by any of its officers." (internal quotation marks and alterations omitted)).

*C.    Admissibility of the Detention Center Manual*

Finally, we need not reach the defendants' argument that the detention

19

center manual and its policies are inadmissible as irrelevant and as a possible source of jury confusion. Even assuming the detention center manual and its policies are admissible for purposes of this appeal, the evidence does not create a genuine issue of material fact as to the subjective component of deliberate indifference to serious medical needs.

We affirm the district court's grant of summary judgment in favor of defendants.