**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 6, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MARIO WILLIAMS,

        Plaintiff - Appellant,

v.

CHAD MILLER, Warden; FNU BRIGGS,
Assistant Warden; FNU SELLERS, Health
Service Administrator; FNU WEISSMAN,
Prison Doctor; LT. BATTLES; FNU FOX,
Chaplain; CORRECTIONS
CORPORATION OF AMERICA, INC.,

        Defendants - Appellees.

No. 16-6346
(D.C. No. 5:14-CV-00061-W)
(E.D. Okla.)

**ORDER DISMISSING FRIVOLOUS APPEAL AND
IMPOSING A STRIKE UNDER 28 U.S.C. § 1915(g)**[*]

Before **LUCERO**, **O'BRIEN**, and **MORITZ**, Circuit Judges.

Mario Williams, an Oklahoma state prisoner proceeding pro se,[1] filed a 42 U.S.C.

---

[*] Oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). We have decided this case on the briefs.

This order is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to this order must be accompanied by an appropriate parenthetical notation – (unpublished). *Id*.

§ 1983 complaint against the Corrections Corporation of America (CCA) and several of its employees (collectively Defendants) alleging violations of the Religious Land Use and Institutionalized Persons Act (RLUIPA), his First and Eighth Amendment rights, and Oklahoma law. The district judge dismissed some of the claims against some of the defendants and granted summary judgment to the remaining defendants on the remaining claims. Williams appeals only from the entry of summary judgment.[2] His appeal is limited to two claims—violations of the First and Eighth Amendments.[3] We dismiss this frivolous appeal.

## I. First Amendment Free Exercise Claim

On May 15, 2013, the Oklahoma Department of Corrections (ODOC) transferred Williams to the Cimarron Correctional Facility (CCF), which CCA operates pursuant to a contract with the ODOC. He was placed in the maximum-security housing unit at CCF.[4]

Williams is a Muslim. He requested to participate in Jumu'ah, the Muslim

---

[1] We have liberally construed Williams' pro se filings. *Ledbetter v. City of Topeka, Kan.*, 318 F.3d 1183, 1187 (10th Cir. 2003).

[2] The district judge referred Defendants' summary judgment motion to a magistrate judge for report and recommendation. The magistrate judge issued a thorough 39-page report recommending the motion be granted. After de novo review, the district judge adopted the recommendation in toto. As a result, we draw the district judge's conclusions from the magistrate judge's report and recommendation.

[3] The judge declined to exercise supplemental jurisdiction over Williams' state law claims. Williams asks that if we reverse any part of the judgment, we reinstate his state law claims. Since we are not reversing, there is nothing to reinstate.

[4] The ODOC has three levels of custody—minimum, medium, and maximum security. Maximum-security is for high-risk inmates. Williams entered ODOC custody in June 1994 after being convicted of first-degree murder and sentenced to life without parole. He was previously classified as a medium-security inmate. His lengthy history of prison misconduct resulted in his being re-classified to maximum-security.

congregate services, but the prison does not allow maximum-security inmates to participate in group worship (or any group activities for that matter) because they are high-risk inmates, especially when outside their cells. As a result, to protect prison staff and other inmates, these inmates are restricted to their cells 23 hours a day and must be handcuffed and escorted by staff any time they are removed from their cells.

Williams claims the group worship policy violates the Free Exercise Clause of the First Amendment. He named Arthur Fox, the prison's chaplain, and Chad Miller, the warden, as defendants.[5]

The judge decided the prison's prohibition of group worship by maximum-security inmates "substantially burdened [Williams'] sincerely-held religious beliefs" but the decision was justified by "legitimate penological interests"—prison security and the safety of prison staff and other inmates. *See Kay v. Bemis*, 500 F.3d 1214, 1218 (10th Cir. 2007) (quotation marks omitted). He also concluded the decision was reasonable under the factors set forth in *Turner v. Safley*, 482 U.S. 78, 89-91 (1987) (factors to consider include: (1) whether a rational connection exists between the prison regulation and the legitimate governmental interest advanced to justify it; (2) whether alternative means of exercising the right are available; (3) what effect accommodating the exercise

---

[5] In his statement of the issues, Williams claims Fox and Miller violated both the First Amendment and RLUIPA by denying him the opportunity to participate in group worship. However, in the discussion section of his brief, he mentions only the First Amendment. In any event, as the judge correctly decided, Williams cannot bring individual capacity RLUIPA claims against Fox and Miller. *See Stewart v. Beach*, 701 F.3d 1322, 1334-35 (10th Cir. 2012).

of the constitutional right would have on guards and other inmates; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the right).  He found the decision was rationally connected to the safety and security risks associated with escorting maximum-security inmates to and from group activities; the policy does not restrict Williams from exercising his right to worship in his cell; and Williams had pointed to no alternative that would accommodate his right at de minimis cost to the prison's security and safety concerns.

Williams objects.  According to him, the record does not give "a precise weight of the cost that the Defendants would have to pay in order to run group service for the maximum inmates." (Op. Br. at 11-12.)  He also suggests the stated penological interests are speculative, exaggerated, and post-hoc rationalizations.  He is mistaken.

The record contains the affidavit of John Hilligoss, currently the Chief of Unit Management at CCF and a member of CCF's security staff who made the decision to deny group worship to maximum-security inmates.  It provides adequate justification for the decision—allowing maximum-security inmates to participate in group worship would have a serious impact on (1) prison security, (2) the safety of prison staff and other inmates, and (3) prison resources.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (prison regulations requiring inmates working outside to remain outside all day did not violate the First Amendment's Free Exercise Clause even though the regulations resulted in Muslim inmates missing Jumu'ah).  The stated penological interests are neither speculative nor exaggerated.  *See Hammons v. Saffle*, 348 F.3d 1250, 1254-55 (10th Cir. 2003) (maintaining prison order and safety is a legitimate penological interest).

In his reply brief, Williams raises two additional arguments for the first time on appeal. We need not consider these arguments. *See Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) ("[A] party waives issues and arguments raised for the first time in a reply brief.") (quotation marks omitted). They are utterly without merit; we briefly mention them because they reveal how fatuous unrestrained prisoner litigation can become.

First, he argues Hilligoss' affidavit is hearsay. But it contains no out-of-court statements. *See* Fed. R. Evid. 801. Additionally, it satisfies the requirements of Fed. R. Civ. P. 56(c)(4)—it is made on personal knowledge, sets out facts that would be admissible in evidence, and shows he is competent to testify on the matters stated.

Second, he claims prison staff moves maximum-security inmates out of their cells for daily showers and recreation. According to him, it would take no more staff to escort them to group services. However, the security staff's concern was not simply a lack of resources to move maximum-security inmates. Its main concern was the high risk these inmates pose to prison staff and other inmates when outside their cells and in a group setting. Nothing in the record indicates maximum-security inmates shower or recreate in groups.[6]

---

[6] The judge provided an alternative reason for entering summary judgment on the First Amendment claim against Miller—Miller did not personally participate in the alleged constitutional violation because the security staff, not the warden, made the decision to prohibit maximum-security inmates from participating in group worship. Williams disagrees. He claims his grievance should have alerted Miller to the matter. He also claims the Hilligoss affidavit puts Miller as a part of the security staff who made the decision. The affidavit is ambiguous. Hilligoss initially says the security staff made the

## II. Eighth Amendment Denial of Medical Care

Williams' Eighth Amendment claim concerns the medical treatment he received

at CCF for his fingers, wrists, and right knee.  He also alleges he was not adequately

supervised during his hunger strike, as required by prison policy.  He names Warden

Miller and Theresa Sellers, the prison's Health Services Administrator, as defendants.[7]

However, his claim against Miller is limited to the hunger strike.

### A.  Denial of Medical Treatment for Fingers and Right Wrist

In May 2013, shortly after arriving at CCF, Williams complained of finger and

right wrist pain resulting from an injury he suffered in April 2013 while working out at

Davis Correctional Facility (DCF) (where he was housed before being transferred to

CCF).[8]  He wanted repeat x-rays on his fingers, even though previous x-rays taken at

---

decision but later refers to the reasons the "facility administration" made the decision. (R. Vol. 2 at 287.)  The facility's administration could well include Miller, but it matters not.  Even assuming Miller personally participated in the decision, Williams' claim still fails for the reasons we explained.

We also note Fox's diminutive role in the claimed constitutional violation—only informing Williams of the decision.  Nothing in the record suggests he participated in the decision-making process.

[7] In his statement of the issues, Williams says CCA also violated the Eighth Amendment by not providing necessary medical care.  However, in the discussion section of his brief, his Eighth Amendment claim is limited to complaints about the acts of Sellers and Miller.  Nevertheless, as the judge concluded, CCA is not liable where, as here, no individual defendant has violated the Eighth Amendment.  *Cf. Trigalet v. City of Tulsa, Okla.*, 239 F.3d 1150, 1155-56 (10th Cir. 2001) (a municipality cannot be held liable for the actions of its employees if the employees' actions do not constitute a constitutional violation).

[8] On May 15, 2013, upon transferring to CCF, Williams was asked a series of questions concerning his health.  Interestingly, when asked whether he had any significant injuries, he did not mention his fingers or wrist.

DCF after the injury showed <u>no fractures or dislocations</u> and he denied reinjuring those fingers. His request for repeat x-rays was denied, but he was undeterred.

He initiated a hunger strike on May 29 in an attempt to force the issue. His tactics worked; repeat x-rays were performed on June 6. Those x-rays showed fractures to two fingers. He was sent to Oklahoma University (OU) Medical Center in mid-July for further x-rays and was seen at OU Medical Clinic. An OU doctor noted some loss of range of motion and decreased grip strength but the recent x-rays showed the fractures to be well healed. The doctor concluded his pain should improve with time.

On July 23, 2013, a prison doctor treated Williams for right wrist pain. He ordered x-rays, which were taken three days later. Those x-rays were normal. Nevertheless, the doctor gave Williams range of motion exercises, prescribed an anti-inflammatory, and told him to splint the wrist when active.

Williams alleged Sellers did not provide proper medical treatment for his fingers and right wrist in violation of the Eighth Amendment. The judge decided the only action Sellers took with regard to his medical care for his fingers and right wrist was to respond to Williams' May 31 "Request to Staff." In that request, Williams asked to be sent to a local hospital for an MRI on his fingers and right wrist. Sellers responded on June 3, directing him to complete a health care request. The judge concluded such conduct was not tied to any violation of his constitutional rights.

On appeal, Williams claims Sellers told him he would be taken to a local hospital for an MRI. He points to her June 3 response. He significantly overstates the record. She simply told him to use the appropriate form to make the request for an MRI.

Williams also points to Sellers' affidavit in which she says she "oversee[s] the scheduling of visits between the inmates and [the prison's] doctors" and states her belief, based on her own observations and Williams' medical records, that staff members were attentive to his requests and medical condition. (R. Vol. 2 at 270.) Merely overseeing scheduling and making observations hardly satisfies the subjective component of the deliberate indifference test. *See Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (subjective component of deliberate indifference test to satisfy the Eighth Amendment requires a defendant to know of an excessive risk to an inmate's health and to disregard that risk by failing to take reasonable measures to abate it).

In any event, without a constitutional violation by her subordinates, Sellers cannot be held liable as their supervisor. *See Serna v. Colo. Dep't of Corrs.*, 455 F.3d 1146, 1151 (10th Cir. 2016) ("In order to establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must first show the supervisor's subordinates violated the constitution."). The record is clear—the doctors and nurses at CCF did not act with deliberate indifference in treating Williams' fingers and right wrist.[9]

X-rays taken at DCF following his injury revealed no fractures.[10] Because Williams had not claimed any re-injury, the medical staff at CCF reasonably relied on those x-rays. Although later x-rays showed fractures, they did not reveal when the

[9] According to her affidavit, Sellers only supervises the prison's nurses and medical records clerks. Therefore, she could only be liable as a supervisor for the acts of those individuals, not the doctors who treated Williams.

[10] Williams filed a lawsuit against the staff at DCF for the medical care he received there for his fingers and wrist. That suit is currently on appeal. *See* Appeal No. 17-7022.

fractures occurred but did show them to be well healed. As to his right wrist, x-rays were taken three days after he reported pain. The x-rays came back negative. Nevertheless, he was provided pain medication, exercises, and splints.

Charitably assuming his medical needs were serious, the prison's medical staff clearly acted reasonably in responding to and treating those needs.

*B. Denial of Treatment as Recommended by Warford for Right Knee and Left Wrist*

In late December 2010, over two years before his transfer to CCF, Williams had an MRI of his right knee. The MRI showed chondromalacia patella (damage to the cartilage under the kneecap) and a mild degenerative narrowing of the knee. In March 2011, Travis Warfold, a certified physician assistant, saw Williams concerning his knee and left wrist. Warford prescribed ice, an exercise program, and anti-inflammatory medication for his knee. He also recommended Williams be seen by a hand specialist for his left wrist.[11]

In August 2011, Dr. Mark Reiheld, a prison doctor at DCF, saw Williams for knee and wrist pain. Reiheld told Williams to proceed with the exercises previously recommended and to continue taking Motrin. Williams wanted to see an orthopedist, but Reiheld refused his request because he had no operative problem and treatment would be symptomatic, i.e., directed at relieving his symptoms as opposed to treating any

---

[11] Williams and the judge refer to Warford as a doctor. But the initials after his name, PA-C, indicate he is a certified physician assistant. Williams also says Warford recommended he have surgery on his left wrist. Not true. He only recommended referral to a hand specialist.

underlying illness.

After his transfer to CCF, Williams requested and received a support device for his left hand, a knee sleeve to support his right knee, an elbow sleeve, and a thumb stabilizer. He was also authorized to sleep on the bottom bunk due to his history of wrist, elbow, and knee injuries.

In late September 2013, he sent a grievance to Sellers requesting the treatment recommended by Warford in 2011. She denied the request saying she would follow the more current recommendation.

Williams claimed Sellers violated the Eighth Amendment by denying him Warford's recommended treatment. The judge disagreed, saying Sellers' decision to rely on the more current diagnosis of William's medical condition—Reiheld's diagnosis—did not constitute deliberate indifference, especially because Williams had not shown any change in his condition since Reiheld's assessment. Williams merely disagreed with the recommended course of treatment, which is not enough to state an Eighth Amendment violation. *See Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006) (prisoners do not have an Eighth Amendment right to a particular course of treatment).

The only issue Williams raises on appeal is that Sellers did not indicate what "more current diagnosis" she was relying on when denying his grievance. (Appellant's Br. at 14.) That is a far cry from deliberate indifference to a serious medical need. *See Martinez*, 563 F.3d at 1088-89. Moreover, it is obvious that she was relying on Reiheld's

diagnosis, which came after Warford's recommendations.[12]

### C. Failure to Monitor During Hunger Strike

As noted previously, on May 29, 2013, when Williams did not get the repeat x-rays he wanted, he initiated a hunger strike at supper. Prison policy requires staff to escort inmates on a hunger strike to the medical unit for evaluation. Although a prison nurse checked on Williams in his cell on June 1 (twice) and June 4, he was not escorted to the medical unit until June 5, 2013, when he fell and hit his head during prayers in his cell. He ended the strike the next day when the prison doctor ordered repeat x-rays.[13]

Williams claims Sellers and Miller violated the Eighth Amendment by leaving him in his cell during the hunger strike, contrary to prison policy. The judge found no

---

[12] Williams also makes a conclusory claim that his condition changed while incarcerated at CCF, as evidenced by the prison providing him a knee sleeve and wrist support. However, providing him support devices does not necessarily show a change in condition. Another reasonable interpretation is that prison staff was simply responding to his current complaints. No one denies he complained about knee and wrist pain. The dispute is over the course of treatment—Williams advocated for one method of treatment, but Reiheld prescribed another.

[13] This was not the first time Williams resorted to a hunger strike as a manipulation tactic. On the morning of May 18, 2013, he declared a hunger strike only to cancel it later that day once he received his personal property. He admitted to initiating the hunger strike to obtain his personal property.

The nurse who checked on him on June 1 reported that Williams told her: "'I have been doing this for twenty years and I know how to get what I want and I know that medical has to place me in the medical department and keep an eye on me and I will stay there until the doctor sees me again and I get the x-ray I want.'" (R. Vol. 2 at 187.) That same nurse also allegedly heard him tell another inmate through the vents "that he knows how to manipulate the system to get what he wants and eventually medical will get tired of dealing with him and give him what he want[s]." (*Id*.) That is the hallmark of a petulant child.

evidence that either Sellers or Miller was notified of the hunger strike. Without knowledge, they could not have acted with deliberate indifference to his medical needs. *Martinez*, 563 F.3d at 1089 (subjective component of deliberate indifference test requires a defendant to know of an excessive risk to an inmate's health and to disregard that risk by failing to take reasonable measures to abate it). Moreover, neither of them was personally responsible for providing him medical care as both played administrative roles at the prison.

Williams tells us prison policy requires staff to notify the warden and the Health Services Administrator when it observes an inmate to be on a hunger strike. Therefore, he says, Sellers and Miller knew or should have known he was on a hunger strike. He also claims Miller knew about the hunger strike because he notified Miller via a "Request to Staff" on June 3 that prison staff was not sufficiently monitoring him during his hunger strike.

It is doubtful that prison staff violated the prison's hunger strike policy by not moving Williams to the medical unit sooner. The policy requires staff to escort an inmate to the Health Services Department and to notify the Health Services Administrator and the Warden if the inmate meets the criteria for a hunger strike. The policy says an inmate is considered to be on a hunger strike when he "communicates to the staff <u>and</u> is observed by the staff to be refraining from caloric intake in either solid or liquid form for a period of time, ordinarily in excess of seventy-two (72) hours" or "[w]hen staff observe[s] [him] to be refraining from caloric intake in either solid or liquid form for a period in excess of seventy-two (72) hours." (R. Vol. 2 at 276.) Although Williams said he started the strike

- 12 -

at supper on May 29, the nurse who checked on him on June 1 (72 hours after his declared hunger strike) noted he had a large amount of commissary food items under his bed.[14] The record also reveals the security staff observed Williams eating on June 2. Given the available food items and the security staff's observations, the prison staff reasonably believed Williams did not satisfy the hunger strike criteria until June 5 (72 hours after June 2) at the earliest. At that time, staff moved him to the medical unit and regularly monitored him. A prison doctor also visited him.

The question though is not whether certain prison staff violated prison policy but rather whether Sellers and Miller violated the Eighth Amendment. As the judge decided, even assuming his medical need was serious, Williams cannot show they acted with a sufficiently culpable state of mind. That is because other than claiming Sellers should have known because staff was required to tell her, there is no evidence she in fact knew. As to Miller, Williams did send him a "Request to Staff" on June 3 complaining of false reports that he had eaten during his hunger strike. He denied having done so and asked that his vitals be taken to prove it. On June 5, 2013, Miller responded, saying records showed Williams had taken a lunch and had commissary food items in his cell. Nevertheless, Miller implemented the hunger strike protocol. Prison staff took Williams

---

[14] Williams blames prison staff for not removing the food items from his cell, as required by prison policy. But, as explained below, a defendant's violation of a prison policy does not a constitutional violation make. *See Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation."); *see also Hostetler v. Green*, 323 F. App'x 653, 657-58 (10th Cir. 2009) (unpublished) (noting a defendant's mere violation of a prison regulation does not equate to a constitutional violation). He also suggests those food items belonged to his cellmate. Convenient, but hardly convincing.

to the medical unit that day. Moreover, without any connection to the alleged constitutional violation, Miller's mere response to Williams' grievance is not enough to establish the personal participation necessary to state a § 1983 claim. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) ("[A] denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983.").

Finally, neither Sellers nor Miller is liable as a supervisor because Williams has not shown that their subordinates committed any constitutional violation. Merely showing that they may have violated prison policy is not enough. *See Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993) ("[A] failure to adhere to administrative regulations does not equate to a constitutional violation."); *see also Hostetler v. Green*, 323 F. App'x 653, 657-58 (10th Cir. 2009) (unpublished) (noting a defendant's mere violation of a prison regulation does not equate to a constitutional violation).[15]

### III. Conclusion

We have purposefully taken pains to lay bare the operative facts and address all of Williams' arguments (even providing alternative grounds of resolution for most of his claims). His appeal comes downs to this—conclusory arguments lodged against three

---

[15] Williams also complains the judge erroneously relied on the special report prepared by Defendants. However, it appears the judge did not rely on the report because none of the parties did so. (R. Vol. 2 at 319 n.2.) Indeed, the special report mainly outlined Williams' grievances whereas his medical records, grievances, and Defendants' affidavits were attached to either the complaint or motion for summary judgment. The judge relied on those items, as did we.

individuals who had little or no role in the alleged constitutional violations, other than to respond to Williams' requests or grievances. The judges in the district court clearly and meticulously laid it out. This appeal from the summary judgment makes no serious effort to explain how the judges erred. Williams is vainly hoping to find a better fishing hole while using the same old bait.

Because this appeal is frivolous, we **DISMISS** it. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (an argument, like a complaint, "is frivolous where it lacks an arguable basis either in law or in fact").

The district judge forewarned this result. He denied Williams' request to proceed in this appeal without prepaying the fees (*in forma pauperis* or *ifp*). *See* 28 U.S.C. § 1915(a). He concluded: "[E]ven assuming Williams lacks the financial ability to pay the required filing fees, . . . Williams will not be able to present a reasoned, nonfrivolous argument on the law and facts in support of his contention that the Court erred when it entered judgment on November 15, 2016. Williams' appeal therefore is not taken in good faith."[16] (D. Ct. Doc. 93 at 2.) *See* 28 U.S.C. § 1915(a)(3). The judge was right.

---

[16] The payment of filing and docketing fees is required in nearly all appeals, criminal as well as civil. *See* 28 U.S.C. §§ 1913, 1917. However, there is an important exception; we excuse prepayment of fees to prevent forfeiture of potentially meritorious appeals because of a person's impecunious circumstances. Frivolous appeals are not among those so excused because, by definition, they are not potentially meritorious. *Neitzke v. Williams*, 490 U.S. 319, 324 (1989) (Congress enacted § 1915(a) "to ensure that indigent litigants have meaningful access to the federal courts"; however, at the same time it recognized "a litigant whose filing fees and court costs are assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits"); *see also DeBardeleben v. Quinlan*, 937 F.2d 502, 505 (10th Cir. 1991) (to proceed *ifp* on appeal, "an appellant must show a financial inability

We have fully addressed the issues Williams has frivolously raised, rendering moot his renewed request to proceed *ifp* on appeal. Accordingly, the motion is **DENIED**, but that does not end the matter. The relevant statute does not permit litigants to avoid payment of fees; only prepayment of those fees. *See* 28 U.S.C. § 1915(a) (allowing courts to authorize the commencement of a civil or criminal suit or appeal "without *prepayment* of fees or security thereof") (emphasis added). All filing and docketing fees ($505.00) are due and payable to the Clerk of the District Court.

Because we have dismissed this appeal as frivolous, we impose a strike under 28 U.S.C. § 1915(g).

**Entered by the Court:**

                                     **Terrence L. O'Brien**
United States Circuit Judge

---

to pay the required filing fees *and* the existence of a reasoned, nonfrivolous argument on the law and facts in support of the issues raised on appeal") (emphasis added).