FILED
United States Court of Appeals
Tenth Circuit

May 7, 2019

Elisabeth A. Shumaker
Clerk of Court

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

JOHN MICHAEL BROADUS,

    Plaintiff - Appellant,

v.

CORRECTIONAL HEALTH
PARTNERS, INC.,

    Defendant - Appellee,

and

COLORADO DEPARTMENT OF
CORRECTIONS,

    Defendant.

No. 18-1284
(D.C. No. 1:15-CV-00182-WJM-KLM)
(D. Colo.)

_____

## ORDER AND JUDGMENT[*]
_____

Before **HARTZ**, **MATHESON**, and **CARSON**, Circuit Judges.
_____

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

John Michael Broadus, a Colorado state prisoner proceeding pro se,[1] appeals from the district court's order granting summary judgment in favor of Correctional Health Partners, Inc. (CHP) on his claim under 42 U.S.C. § 1983 for violation of his Eighth Amendment rights. According to Broadus, CHP acted with deliberate indifference to his serious medical needs when it denied a request from a physician assistant at the medical clinic in Sterling Correctional Facility (Sterling) to send him to an outside specialist for a magnetic-resonance-imaging scan (MRI).[2] Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

On February 28, 2014, Broadus injured his right knee while playing basketball. Over the next few days, Broadus unsuccessfully tried to get treatment for his knee. On March 5, Lieutenant Luyando, a correctional officer, denied Broadus's request to declare a medical emergency. According to Broadus, he was told shortly thereafter that he was being moved to a new cell and assigned to a top bunk. Broadus met with Luyando and objected to the top bunk assignment because his knee injury prevented

---

[1] Although Broadus is proceeding pro se on appeal, he was represented by appointed counsel in the district court through discovery and summary-judgment briefing.

[2] Broadus also sued several Sterling employees for numerous alleged violations of his constitutional rights. The district court granted summary judgment in favor of all except two of the Sterling defendants, and those claims proceeded to trial. The jury did not render a verdict, however, because Broadus and the remaining defendants reached a settlement. Broadus appeals only from the summary judgment in favor of CHP.

him from climbing to a top bunk. When Broadus refused the reassignment, Luyando ordered him moved to segregation.

Before an inmate can be placed in segregation, he must undergo an anatomical examination. The nurse who performed Broadus's examination on March 5, 2014, noted "[s]welling" in his right knee, but found "[n]o medical attention needed [at] this time." R., Vol. IV at 36.

After Broadus completed his time in segregation, he was seen at the Sterling medical clinic by Keri McKay, a physician assistant. In the "Subjective" part of her treatment notes from a March 25, 2014 examination, McKay noted that Broadus complained of a "dull constant ache" in his right knee and he reported "trying to just take it easy on his knee with little relief." *Id*. at 38. In the "Objective" section of her notes, McKay wrote first that Broadus "ambulate[d] into clinic, in and out of chair without difficulty," but then noted that Broadus "[a]mbulate[d] with antalgic gait favoring the right leg." *Id*. Also, she reported that the "McMurr[a]y's [test was] positive in the right leg and negative in the left leg." *Id*.[3] McKay noted that she would request an MRI to determine whether Broadus had a torn meniscus.

McKay's request for an MRI was sent to CHP, a private company under contract with the Colorado Department of Corrections (CDOC). As part of its services, CHP reviews requests and decides whether to authorize inmates to receive medical care outside of CDOC's internal medical system. CHP, however, does not

---

[3] McMurray's test involves "rotation of the tibia on the femur to determine injury to meniscal structures." Stedman's Medical Dictionary 906520 (Westlaw ed. Nov. 2014 update).

have the final say on whether to authorize outside medical treatment for an inmate; a denial of authorization can be appealed (but not by the inmate), and if the parties cannot agree, the final decision is made by CDOC's chief medical officer.

The March 25 MRI request was reviewed and denied on April 10 by Stephen R. Krebs, M.D., an adjudicator who worked for CHP, who wrote: "Declined at present. Exam only partially suggestive, no plain films described or included, and no conservative therapy described." *Id*. at 138.

On June 2, McKay submitted a second request to CHP for an MRI, which stated in relevant part:

> Consulting for an MRI of his right knee due to needing further evaluation of joint damage. [Inmate] ambulating with antalgic gait, wearing knee brace, pain medications, and done physical therapy on his own with little relief. Will send encounter form 3/25/14. . . . Xrays returned and showing no evidence of bone damage. MRI prior was denied due to not having the xray. Has xrays and still needing an MRI to evaluate knee pain and underlying damage as McMurr[a]y's test was positive, and he is having difficulty and pain with walking.

*Id*. at 15. On June 13, Dr. Krebs denied the second request because there was "no objective impairment of ADLs [activities of daily living] noted." *Id*. There is no evidence of an appeal of either the April or June decision.

In his deposition Dr. Krebs described his role as follows:

> [O]ur job was to evaluate information that was sent to us for medical necessity for a variety of requested referrals. We were given specific information and we were asked to make a decision based on that provided information and we were to do it based on clinical guidelines and some unique correctional overlays and then we were asked to make decisions.

4

*Id.*, Vol. I at 302–03. He was not to speak directly with providers. He later explained what he meant by "correctional overlays":

> [I]f an inmate came in with a medical process we were told it was not our responsibility that the patient left in dramatically better condition than they came in. . . . So, for instance, if you came in with a bad knee, if you came in with an ACL tear, that was a preexisting condition, we weren't required to fix those. . . . [M]edically necessary were those things necessary to provide good basic healthcare so that a person could remain healthy and so that prisoners could continue to perform their ADLs in their environment.

*Id*. at 304. When asked about conditions that arose at prison, Dr. Krebs responded:

> [T]he idea was . . . that the individual needed to be able to where possible function in the ADLs. . . . We were not required to restore people to athletic greatness. So, there were cases where patients ruptured a muscle lifting weights and if their activities of daily living were not impaired, we were instructed not to authorize those because they were not required for basic healthcare or activities of daily living.

*Id*. He acknowledged the need for treatment of significant pain but noted that pain is often treatable conservatively, without surgery. He provided an example: "Shortly after an ACL disruption there is terrific pain. A surgical repair doesn't alleviate that pain. Anti-inflammatory, icing, the passage of time alleviates that pain. The surgical procedure contemplated is not . . . a pain-relieving tool." *Id*. at 306.

Dr. Krebs was questioned specifically about the McMurray's test. He opined: "The sensitivity and specificity of McMurray's test is 50 percent, which means it's wrong as much as it is correct. . . . McMurray's test, since the specificity and sensitivity is a crapshoot, is not considered particularly actually clinically helpful at the present time." *Id*. Dr. Krebs acknowledged that the Milliman Care Guidelines were used in his work. He was asked if "[u]nder the Milliman Guidelines . . . there

5

[is] any one factor that would be sufficient to warrant an MRI?" He responded: "There's no single factor that would be." *Id.*

On September 16, 2014, a different physician assistant at the Sterling medical clinic submitted a request to CHP for Broadus to receive physical therapy. That request was approved by CHP on October 6.

According to Broadus, CHP violated his Eighth Amendment right to receive medical care when Dr. Krebs, acting under company policy, denied the June request for an MRI. (He does not challenge the denial of the March request.) Broadus maintained that CHP's "policy requiring the presentation of several factors to support that an MRI is medically necessary" is contrary to "the medical standard for MRIs." *Id.*, Vol. III at 26. As to the "medical standard," Broadus presented testimony from a physician whose opinion he paraphrased as follows: "[T]he McMurray's test is the general medical standard for patients with a meniscus injury," and "an MRI is the 'standard of care in the medical community' where there is a positive McMurray's test." *Id.* at 17.[4] In other words, Broadus's claim was based on his expert's medical

---

[4] It is not clear to us that the expert's opinion was quite so categorical. We note the following exchange in the limited portion of Dr. Jeffrey Wunder's deposition that appears in the appellate appendix:

> Q. Okay. And so your conclusion is that an MRI would be determinative of that issue, and that it is called for based on the history and physical presentation of Mr. Broadus?
> A. Well, firstly – and I think what these guys are saying is that even if there's a high suspicion of meniscus injury, conservative treatment is warranted first.
> Q. Okay.

judgment that the standard of care requires ordering an MRI if there has been a positive McMurray's test.

The district court assumed that CHP had a policy that required the presentation of several factors to support the medical necessity for an MRI; that Dr. Krebs followed that policy when he denied the June 2, 2014 request; and that a positive McMurray's test is the standard of care in the medical community for performing an MRI. Nonetheless, the court concluded that summary judgment was proper because "[a] trial on this matter would essentially be asking a jury to listen to the testimony of Dr. Krebs and the testimony of Broadus's medical expert, and then to judge whether [CHP] impermissibly deviated from the medical standard of care." *Id*. at 445. Relying on the well-established principle that mere medical malpractice cannot rise to an Eighth Amendment violation, the court concluded that medical malpractice that "allegedly flowed from an official policy" likewise did not rise to a constitutional claim. *Id*.

---

A. And that should have been – that should have been with the physical therapist. It should be supervised physical therapy. In this particular case, he was – stated he was given some [transcript terminates at that point].

R., Vol. III, at 35.

7

## ANALYSIS

**Summary Judgment**

We review de novo the district court's grant of summary judgment, applying the same standard that the district court is to apply. *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We construe the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

**Eighth Amendment**

Broadus's Eighth Amendment claim was based on the "gatekeeper" theory of liability. *See Sealock*, 218 F.3d at 1211. That theory governs when "prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id.*

"A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Id.* at 1209. "The test for deliberate indifference is both objective and subjective." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Normally, the objective component requires that the harm be sufficiently serious to implicate the Eighth Amendment. *See id.* Where gatekeeper liability is involved, the objective component requires "substantial harm," which includes delay leading to "lifelong handicap, permanent loss, or considerable pain."

8

*Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (internal quotation marks omitted).

"The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751. Under this standard, "a prison official cannot be liable unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (internal quotation marks omitted). Such an inference *cannot* be drawn solely from evidence that a diagnosis or course of treatment was debated or debatable. *See Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006) (prisoners do not have Eighth Amendment right to a particular course of treatment); *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (same). "[T]he negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Self*, 439 F.3d at 1233 (internal quotation marks omitted).

In addition, as the district court explained, "Broadus's case against CHP involves another layer of complexity because CHP is a business entity, not a natural person." R., Vol. III at 444. In a suit under § 1983, a private entity acting under color of state law "cannot be held liable *solely* because it employs a tortfeasor." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (internal quotation marks omitted). Instead, Broadus was required to identify an official policy or a

9

custom that was the "direct cause" or "moving force" behind the constitutional violation. *Id*. at 1215 (internal quotation marks omitted).

According to Broadus, summary judgment was inappropriate because "a genuine issue of material fact exists whether Dr. Krebs's denial of Mr. Broadus's [MRI] was representative of a CHP policy to deny MRIs *even though they were medically necessary and required for basic medical standards*." R., Vol. III at 26 (emphasis added). But even if Dr. Krebs erred regarding the utility of the McMurray's test when he declined the request for an MRI, negligence cannot sustain a deliberate-indifference claim. Thus there was no constitutional violation, so CHP policy is irrelevant. We affirm the district court's grant of summary judgment.

**Supplementing the Record**

Broadus also argues that the district court abused its discretion when it accepted the Milliman Care Guidelines as part of the summary-judgment record. CHP did not produce relevant sections of the Guidelines until its reply brief on summary judgment. Without attributing any fault to CHP, the district court decided that it was "in the interest of justice . . . to accept the . . . Guidelines as a part of the record." Aplee. Supp. R. at 7. But the district court did not mention the Guidelines or rely on them in resolving the motion for summary judgment. Nor do we rely on them on appeal. Because the issue "has no bearing on the ultimate outcome of [the] case," we will not address it on appeal. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1154 (10th Cir. 2005).

10

## CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court


Harris L Hartz
Circuit Judge